747 F.2d 197
 5 Employee Benefits Ca 2521
 Vickie D. LeFEBRE, Administratrix, Estate of Don C. LeFebre, Appellee,
v.
WESTINGHOUSE ELECTRIC CORP. Management Disability Benefits
Plan; Westinghouse Electric Corporation and
Equitable Life Assurance Society of the
United States, A New York
Corporation, Appellants,
and
Metropolitan Life Insurance Company, a New York Corporation,
Defendant.
Vickie D. LeFEBRE, Administratrix, Estate of Don C. LeFebre, Appellant,
v.
WESTINGHOUSE ELECTRIC CORP., Management Disability Benefits
Plan; Westinghouse Electric Corporation; Metropolitan Life
Insurance Company, a New York Corporation and The Equitable
Life Assurance Society of the United States, a New York
Corporation, Appellees.
 Nos. 82-1965(L), 82-2075.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1984.
Decided Oct. 22, 1984.
Rehearing Denied Nov. 30, 1984.
 
 Werner Weinstock (Joseph G. Williams, New York City; Barrett W. Freedlander, Niles, Barton & Wilmer, Baltimore, Md., on brief), for appellants.
 John T. Ward, Baltimore, Md., (John C. Baldwin, Ober, Kaler, Grimes & Shriver, Baltimore, Md., on brief), for appellee.
 Before WINTER, Chief Judge, CHAPMAN, Circuit Judge and RAMSEY,* District Judge.
 CHAPMAN, Circuit Judge:
 
 
 1
 In March 1979 Don C. LeFebre, a former employee of the defendant Westinghouse Electric Corporation, brought this action against the Westinghouse Electric Corporation Management Disability Plan, Metropolitan Life Insurance Company and the Equitable Life Assurance Society of the United States claiming benefits under the Plan, and seeking compensatory damages because of the alleged breach of fiduciary duties by the trustees of the Plan, penalties because of the defendant's failure to supply certain information requested about the Plan in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sec. 1001 et seq. (ERISA), and attorneys' fees. The case was tried to the court October 20-23, 1981 and the district court filed an opinion on September 29, 1982 finding for the plaintiff on all issues. A supplemental opinion was filed October 25, 1982, 549 F.Supp. 1021, which established the amounts due plaintiff including sizable penalties and attorneys' fees. We find that the district court erred in trying the case de novo rather than considering the evidence available to the trustees on the issue of whether their actions were arbitrary and capricious. We further find that the trustees did not violate any fiduciary duties owed to LeFebre and, therefore, we reverse.
 
 
 2
 * Shortly before this appeal was argued the plaintiff Don C. LeFebre died intestate leaving Vicki D. LeFebre as his surviving spouse. She has been appointed personal representative of the estate of Don C. LeFebre, deceased, and substituted as party plaintiff in this action. Any future reference to the plaintiff will be to the deceased Don C. LeFebre.
 
 
 3
 The plaintiff became employed by Westinghouse as a technical writer in 1953 when he was twenty-seven years old. He worked as a professional engineering writer, supervising other employees, until 1961 when he helped create a motion picture and television department, called the Audio-Visual Department. Technical motion pictures, sound film strips and sound slides were produced by this department and these audio-visual aids were used both by Westinghouse to explain certain products to its customers and by customers as instructional aids for their employees in the use of Westinghouse equipment. LeFebre was the sole production member of the department until 1963 when two assistants were employed. About the time he became involved with the audio-visual department, he learned that he was suffering from an incurable eye disease known as retinitis pigmentosa (RP). The effect of this disease is to gradually reduce the field of vision until blindness occurs. The disease process usually does not move rapidly and in most instances the loss of peripheral vision is gradual. During early stages of the disease, most victims can adjust to the gradual reduction of the vision field and are able to read and use their eyes.
 
 
 4
 In 1970-71 plaintiff began to notice a loss of vision and in April 1972 he was examined by Dr. Richard Susel, an ophthalmologist in Baltimore. Dr. Susel advised plaintiff that his RP was moderately advanced, but found that he was compensating well for his visual disabilities and able to perform his usual work. In 1972 Dr. Susel advised plaintiff that he was legally blind,[1] but this did not mean that he could not see or could not continue to perform his duties at Westinghouse. In September 1973 he was again examined by Dr. Susel and was found to still be suffering from moderately advanced RP.
 
 
 5
 In 1973 plaintiff prepared a written job description for his job at Westinghouse which described his work, duties and responsibilities. It was basically the same as the 1968 job description. It outlined in detail twenty activities that he performed or supervised on a regular basis and four occasional duties or special assignments, but made no mention of his visual problems.
 
 
 6
 At about this time plaintiff developed an aerial image animation stand which he used in his work and which allowed him to compensate for his eye condition. When using this stand he could work alone, at any time of the day or night, and could take his time in setting up the images and effects he wished to create. The animation stand was used in filming special effects, such as superimposed images and split screen pictures. Plaintiff used this device while working on his last project at Westinghouse. This was known as the AWG-10, a training film for the U.S. Navy. This film was well received by the Navy.
 
 
 7
 In 1973 after his visit with Dr. Susel, plaintiff advised his superiors that he wanted to continue working as long as he could.
 
 
 8
 Plaintiff testified that beginning around 1970 he rode to and from work with his wife, who was then employed by Westinghouse. On March 1, 1974 he applied for a new Maryland driver's license and did not advise the state of his eye condition. He testified, however, that he did not begin to drive again until September 1975 when he learned that his wife[2] was having an affair with another Westinghouse employee. When his wife left him, he bought an automobile and began to drive himself. At about this time his wife brought a civil action against him in the Maryland courts to prevent him from driving an automobile while he had custody of their children. He admitted that he moved to Falls Church, Virginia in an effort to avoid service of process in this state suit and that during this time he was driving between various points in Virginia and Maryland. He identified a diary he kept during this period and it showed various activities that would have required fair eyesight on his part. The diary recorded that he took numerous photographs, drove his automobile for long distances, went to movies, attended the circus, and conducted surveillance of his wife and her lover.
 
 
 9
 During the fall of 1975 he requested additional staff and new upgraded equipment for the audio visual department at Westinghouse. During this time he was also writing a history of Norwegian immigrants and working on a proposed radio program called "Gone But Not Forgotten", which would be used for elderly and blind people. During this same time he worked a great deal at night.
 
 
 10
 On December 4, 1975 he drove to the apartment of his wife's paramour and shot him dead. At the time he turned himself over to police he had in his pocket a script he had prepared for a new audio visual project, and he testified that had he not committed the crime on December 4, 1975 he would have remained at Westinghouse through Christmas. He obtained an attorney and was committed to the psychiatric ward at North Charles General Hospital. On December 7, 1975 he filed a claim with Equitable for accident and sickness (short term benefits) claiming total disability as of November 24, 1975 due to mental illness. His physician found that he was suffering from involutional melancholia. Equitable paid full benefits of $150 per week for 26 weeks plus hospital bills totaling $28,753. As of May 10, 1976 plaintiff filed a claim for long term disability benefits because of blindness claiming that this disability began November 24, 1975. On February 18, 1976 LeFebre had been examined again by Dr. Richard M. Susel and Dr. Susel reported his findings to Dr. Arthur Hall of Westinghouse in a letter of March 5, 1976,[3] setting forth LeFebre's visual acuity was reduced to 7? in the right eye and 5? in the left and giving as his impression: retinitis pigmentosa, and concluded "I have told Mr. LeFebre that visual acuity has remained relatively the same state as his last visit to me." The last visit had been in September 1973 when Dr. Susel had found plaintiff to have moderately advanced RP, the same condition he found on his initial examination in 1972. As to the February 1976 examination, Dr. Susel testified: "I felt that his eye examination was essentially the same, just about the same as it was in 1973." Dr. Susel also answered a question as to plaintiff's ability to work at his former job as of the date of the February 18, 1976 eye examination: "If anyone had said, can he still do this job, I would say, I would see no reason why he could not do this job based on my examination of him."
 
 
 11
 Nonetheless, on May 18, 1976 Dr. Susel completed the physician's statement on the Equitable Life Assurance Society disability form showing a diagnosis of RP, that the present condition was described as legally blind secondary to severe field limitation, that the patient had retrogressed since the last examination, and that he was totally disabled from any occupation but was possibly a candidate for a rehabilitation program.
 
 
 12
 On April 2, 1976 Vernon Frame, plaintiff's attorney, wrote to the supervisor of Employee Benefit Plans at Westinghouse applying for total disability benefits commencing May 10, 1976 for the plaintiff under the terms of the Westinghouse Management Disability Benefits Plan. The claim was for blindness due to RP as diagnosed by Dr. Susel. During the summer of 1976 plaintiff qualified for social security disability benefits due to blindness, which under social security regulations is anything less than 20 degree field of view in each eye.
 
 
 13
 In a letter dated November 10, 1976, Howard Jenkner, staff assistant in the employee insurance office of Westinghouse, advised plaintiff that his claim for benefits under the Management Disability Benefits Plan had been submitted to Westinghouse's insurance carrier, the Equitable Life Assurance Society, for determination. The letter provided, in part:
 
 
 14
 They [Equitable] advised that, although you do have a visual impairment, you were able to perform the duties of your occupation prior to the incident on December 4, 1975 and the medical evidence submitted does not indicate a marked deterioration of your eyesight following this incident.
 
 
 15
 They, therefore, advise that your claim for Management Disability Benefits Plan benefits is denied; however, they would be happy to review any further medical evidence which you may wish to submit.
 
 
 16
 Prior to December 1, 1975 the Westinghouse Management Disability Plan was handled by Metropolitan Life Insurance Company. On December 1, 1975 this coverage was transferred to the Equitable Life Assurance Society. Under the plan total disability is defined: "Disability will be considered total as long as it prevents you from performing your regular job or any appropriate work within the company".
 
 
 17
 At Equitable the claim was handled by Michael Susarchick, manager of the Group and Life Benefits Division. He testified that when the claim was originally filed there were discrepancies on the various claim forms, particularly a difference between the disability date claimed and the last date worked. Susarchick requested additional information from Westinghouse concerning LeFebre's work activity, attendance cards, job description, salary action and merit reviews. There was also a concern that the Accident and Sickness claim was for a psychiatric condition, but the claim for long term disability benefits was for blindness. The company also asked for additional information about the murder on December 4, 1975.
 
 
 18
 Mr. Susarchick had been employed by Equitable for 18 years in handling insurance claims with six years as manager of the Group Disability Benefits Division. He made the final decision to deny benefits and based his decision upon the information submitted that showed LeFebre was declared legally blind in 1972, but continued to perform all of his duties thereafter and had a good work record up to his last date of employment, December 1, 1975. Further, that plaintiff had not seen Dr. Susel from 1973, until his visit of February 18, 1976, and he had sufficient eyesight "to fire a gun and hit his target" on December 4, 1975 and according to Howard Jenkner of the Westinghouse Employee Benefits Division, plaintiff would still be working if he had not committed murder. Susarchick also found LeFebre had received an 8.1 percent salary increase two months before he left Westinghouse and 18 percent merit increases in the preceding two years. The evaluation reports for plaintiff were all good.
 
 
 19
 Susarchick also had copies of the accident and sickness claims form, the management disability benefit plan claims form, a complete job description and work records including job descriptions, merit reviews and pay increases. He did not receive attendance records because management personnel did not keep attendance records as such, but maintained charge cards to show time allocated to various accounts. A major portion of plaintiff's duties were supervisory, managerial, planning and budgetary duties that did not require normal peripheral vision, and his performance evaluations showed that he excelled in the areas that actually required visual acuity, all of which was inconsistent with his claim of total disability due to blindness.
 
 
 20
 The letter denying plaintiff's disability benefits solicited additional information and indicated the claim would be reconsidered. Upon receipt of additional information, including an explanation by Dr. Susel of his findings, the Equitable claims manager submitted the claim to Dr. William F. Brown, Jr., a physician trained in industrial medicine, who found that the statement regarding legal blindness did not establish total disability since there was no indication that LeFebre was unable to perform his usual work. The claim was again denied.
 
 
 21
 The record does not reflect how long plaintiff was incarcerated, but at the time of trial, October 20-23, 1981, he was not incarcerated and demonstrated an ability to see and read various exhibits presented to him during his examination and cross-examination. He testified that while in jail he assisted in the preparation of his pleadings and studied ERISA law. He testified that on November 25, 1975 he looked through several thousand photograph slides of family pictures, viewing them through a magnifying viewer. He also stated at the time of trial he was still going to movies and enjoyed attending sporting events.
 
 
 22
 The district court found that there was no evidence establishing any fiduciary responsibility in Metropolitan and all claims as to it were dismissed.
 
 
 23
 The trial court found for LeFebre on each of his three causes of action. It found that both Westinghouse and Equitable breached their fiduciary obligations to plaintiff and that their decision denying him retirement benefits was arbitrary and capricious. The court further found that the evidence at trial established that LeFebre was disabled under the plan as of November 1975 and that Westinghouse supplied, and Equitable acted upon, erroneous, incomplete, and in some instances, irrelevant information in reaching the decision and that this was arbitrary and capricious. The court found that the fact that LeFebre was able to see well enough to drive to the apartment of his wife's paramour and aim and fire a gun accurately enough to kill him was irrelevant to the question of his ability to perform his duties.
 
 
 24
 The court found that it was arbitrary and capricious for the defendants to impose a higher standard of disability on the plaintiff than the plan required and to base their decision on factors unrelated to a determination of whether he could perform his job. The court found that the defendants failed to carry out their fiduciary duty to develop persuasive evidence tending to support the pension entitlement in that they neither sought nor developed specific information available concerning plaintiff's ability to do his job.
 
 
 25
 The district court also found that Equitable failed to furnish plaintiff with claim-related documents and information within 30 days of his request in violation of Sec. 502(c) of ERISA, 29 U.S.C. Sec. 1132(c) and that Equitable failed to furnish a copy of the Summary Plan description as requested in violation of 29 U.S.C. Sec. 1024(b)(4). The court ordered that the plaintiff be given all benefits to which he was entitled under the plan including disability income benefit, medical benefits, pension disability supplement and the death benefits, all to be determined in monetary amounts and paid in a lump sum. It further ordered that he be awarded a full interest in the plan as of May 1976 and awarded sanctions against the defendants in the amount of $74,000 representing $100 per day beyond the first thirty days that the defendants delayed or failed to provide requested documents under ERISA.
 
 
 26
 After entry of the opinion as to liability the court requested a memorandum from each party on the issue of damages. The plaintiff submitted two memoranda on damages and attorneys' fees and the defendants objected to the proof of damages and attorneys' fees by way of memoranda. However, the court proceeded and found:
 
 
 27
 Disability Income Benefit $126,432.72
Medical Benefit 7,914.33
Pension Disability Supplement 59,038.20
Total Death Benefit 27,000.00
 -----------
TOTAL $220,385.25
 
 
 28
 The district court expressed concern over the difficult question of balancing "the pre-payment and future inflation factors with regard to that portion of the plaintiff's total award that relates to future damages". The court adopted the "total offset approach" stating: "The plaintiff suggests that the appropriate balance between discounting to present value and increasing the award to account for inflation is to be found in simply refusing to discount to present value at all." The court also awarded $121,687.50 in attorney's fees to plaintiff's trial attorneys and $2,161.39 to his original attorney Vernon Frame.
 
 II
 
 29
 The court found that the defendants had breached their fiduciary duties in a number of respects: (1) The defendants relied upon "erroneous, incomplete, and, in some instances, irrelevant information in reaching their decision;" (2) "[B]y considering only the aforementioned factors, the defendants improperly applied the Plan Standard of Disability. In particular, by basing their decision on factors unrelated to a determination of whether the plaintiff could perform his job, defendants imposed a higher standard of disability on the plaintiff than the Plan required. This constitutes an arbitrary and capricious construction of the Plan;" (3) The defendants failed to fully carry out their fiduciary duty "to develop persuasive evidence tending to support pension entitlement. They neither sought specific information, nor developed available information concerning plaintiff's ability to do his job. This too renders the claim denial arbitrary and capricious."
 
 
 30
 Westinghouse and Equitable were Plan fiduciaries within the meaning of 29 U.S.C. Sec. 1002(21) and under 29 U.S.C. Sec. 1104(a)(1). A fiduciary of a retirement program:
 
 
 31
 ... shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 
 
 32
 (A) for the exclusive purpose of:
 
 
 33
 (i) providing benefits to participants and their beneficiaries; and
 
 
 34
 (ii) defraying reasonable expenses of administering the plan.
 
 
 35
 (B) With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....
 
 
 36
 29 U.S.C. Sec. 1104(a)(1) ]
 
 
 37
 In Horn v. Mullins, 650 F.2d 35, 37 (4th Cir.1981) we stated:
 
 
 38
 The standard for reviewing a decision of the trustees is whether it is arbitrary or capricious. Seafarers Pension Plan v. Sturgis, 630 F.2d 218, 221 (4th Cir.1980). To determine whether the action was arbitrary or capricious, we must first decide whether the trustees' decision was supported by substantial evidence.
 
 
 39
 The district court looked to Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) for a definition of "arbitrary and capricious". However, the district court opinion quotes only that part of the definition which refers to a decision based upon a "consideration of the relevant factors and whether there has been a clear error of judgment." Failure to consider the entire definition may have been the district court's initial point of error, since it is obvious from the district court opinion that it did not understand its narrow scope of review and it substituted its judgment of the facts for that of the trustees.
 
 
 40
 Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. (Emphasis added). (Citation omitted).
 
 
 41
 Bowman, supra, at 285, 95 S.Ct. at 441.
 
 
 42
 In discussing the origin of this standard of review and its applicability to Pension Plan Trustees, the court in Wardle v. Central States, 627 F.2d 820, 824 (7th Cir.1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981) found:
 
 
 43
 The use of this standard of review in federal courts apparently originated in the District of Columbia Circuit, which has phrased the standard as "whether the Trustees have acted arbitrarily, capriciously, or in bad faith; that is, is the decision of the Trustees supported by substantial evidence or have they made an erroneous decision on a question of law." Danti v. Lewis, 312 F.2d 345, 348 (D.C.Cir.1962). See also Rehmar v. Smith, 555 F.2d 1362, 1371 (9th Cir.1976). A federal court is to focus on the evidence before the trustees at the time of their final decision and is not to hold a de novo factual hearing on the question of the applicant's eligibility. Phillips v. Kennedy, 542 F.2d 52, 54 (8th Cir.1976). As a general matter a court should not resolve the eligibility question on the basis of evidence never presented to the pension fund's trustees but should remand to the trustees for a new determination.
 
 
 44
 The district court made a finding that the denial was arbitrary and capricious upon its conclusion that Westinghouse had furnished false or inaccurate information to Equitable. The court referred to a letter of July 19, 1976 from Howard Jenkner of the Westinghouse Insurance office to Michael Susarchick, manager of the Equitable claims office, which stated:
 
 
 45
 (1) LeFebre's last day of work was December 1, 1975; (2) he "was able to perform all of his duties without difficulty"; (3) he "did not consult an eye specialist until February 18, 1976"; and (4) he could be performing his duties "if he had not committed murder".
 
 
 46
 The court found these assertions "to be inaccurate at best and false at worst. In fact (1) LeFebre's last day of work was November 21, 1975; (2) he was unable to perform most of his duties by the fall of 1975; (3) his eyes were examined by a Westinghouse physician as early as April 1972; and (4) the crime he committed on December 4, 1975 is irrelevant to the question of his ability to do his duties."
 
 
 47
 It is obvious from these conclusions that the district court substituted its judgment of the facts for that of the trustees and did not confine itself to the narrow scope of review required in passing upon the action of the trustees. The record clearly shows that the trustee considered and acted upon a number of facts or representations in addition to those set forth in the letter of July 19, 1976. The trustee was faced with a claim of total disability due to blindness beginning November 24, 1975. The information available to the trustee showed that on December 4, 1975 the claimant could see well enough to drive his automobile through congested traffic to the apartment of his wife's lover and there he could see well enough to kill this individual with a firearm. At the time of his arrest the plaintiff had in his pocket a copy of a proposed movie script he was working on for Westinghouse. The disability claim form had a statement from Dr. Susel that LeFebre was disabled from any occupation, but the letter of Dr. Susel written after the February 18, 1976 visit indicated that LeFebre's "visual acuity has remained relatively the same state as his last visit to me."[4] The last visit prior to February 18, 1976 was in 1973 at which time the doctor found that plaintiff's RP condition was the same that it had been at the 1972 examination, and although the plaintiff was considered legally blind as early as 1973 this was due to only his limited field of vision. The eye doctor had reported that he could continue to do his work because he was compensating well for his condition.
 
 
 48
 The Westinghouse statement that LeFebre's last day of work was December 1, 1975, rather than November 24, 1975, is supported by the record to such a degree that it could not be considered "without justification in fact."
 
 
 49
 The statement by Westinghouse that LeFebre was "able to perform all of his duties without difficulty" was not incomplete, erroneous or irrelevant as found by the district court. There was evidence to show that in late 1975 the plaintiff's duties were about 75 percent administrative and supervisory, a small percent was consulting and the remainder was working with animated films. LeFebre experienced no difficulties in any area except in his work with animated films. This work was still being done by LeFebre but it was taking more time than previously because of plaintiff's visual problems and the fact that he insisted on doing most of this work himself.
 
 
 50
 The statement "He did not consult an eye specialist until February 18, 1976" refers to the first appointment after November 24, 1975, the date he claims disability because of blindness. Such a statement would be very pertinent to a claim of blindness. A prudent person would ask why one claiming blindness in November did not see an eye doctor until February. Even if this had been a misstatement, Equitable had been supplied reports of the previous examinations of Dr. Susel in 1972 and 1973.
 
 
 51
 Westinghouse's statement "He could be performing his duties 'if he had not committed murder' " has support in the record.
 
 
 52
 We find it difficult to understand the district court's conclusion that the events surrounding the December 4, 1975 murder are irrelevant to the question of plaintiff's ability to perform his duties. It would be not only reasonable, but expected of a trustee to view with suspicion a claim of total disability due to blindness from a man, who, two weeks after the date he claimed he was blind, could see well enough to drive an automobile and kill another man with a firearm. It would also be normal for a trustee to view with suspicion such a claim when it had been preceded by a claim for accident and sickness benefits based upon an assertion of emotional and mental illness which immediately followed the slaying. If he was blind as of November 24, 1975, as he claimed in his disability application of May 10, 1976, why would he wait more than six months to make claim?
 
 
 53
 The district court relied upon Toland v. McCarthy, 499 F.Supp. 1183 (D.Mass.1980) for its holding that under ERISA the action of the trustees was arbitrary and capricious because they did not develop persuasive evidence tending to support the claim and that they did not seek specific information or develop available information concerning plaintiff's ability to perform his job. Toland is unpersuasive. It involved the question of whether Toland had the necessary number of years of "Credited Service" in employment to qualify for a pension. There was a dispute as to how many years he had worked as a supervisor and how many he had worked as an employee in the bargaining unit. The pension plan recognized that "many employees do not remember their exact dates of employment in past years and do not have ready 'proof' of employment. The Fund Office will obtain this information by requesting from Social Security its employment records for each pension applicant. This record, which goes back to 1937, will then be used as part of the proof of past employment. Each employer is also asked to verify the employment period and the job classification of employment." In spite of this language the trustees did not ask Toland's employers for the years 1946-1970 to verify his employment or his job classification. The Toland court found that the trustees had a duty to develop this information because the published pension plan committed them to do so, and they had a duty to develop and consider "reasonably available evidence bearing upon the plaintiff's claim". Toland also found that the decisional process of trustees under ERISA was essentially non-adversarial and that since Toland had not been represented by counsel or other representative in making his claim, the trustees had the duty to see that the case was fairly developed.
 
 
 54
 In the present case LeFebre was represented from the beginning by an attorney, who directed the employer and the trustees to transmit everything connected with LeFebre's claim through the attorney. The trustees could not brush the attorney aside and take over the development and investigation of his case. The trustees invited the attorney to submit anything he wished in support of the claim and after denial, advised him that additional information could be submitted and would be considered. The decision was reopened and additional information was considered before the claim was finally denied.
 
 
 55
 Toland involved employment records that were readily available and records that the trustees had agreed that they would verify. LeFebre involves a question of whether the employee was disabled under the plan definition "Disability will be considered total as long as it prevents you from performing your regular job or any appropriate work within the company". The evidence presented to the trustees was substantial on the issue of his ability, even with his very poor eyesight, to perform his regular job. The trustees had the medical reports of Dr. Susel regarding the plaintiff's vision problem and that he compensated well. They were advised that he had worked up until December 1, 1975, that he had received good fitness reports from Westinghouse on his job performance, that he had received over 18 percent in merit increases during the previous two years and an 8.1 percent increase just two months prior to his claim of disability. In spite of his RP LeFebre had not visited his eye doctor for a period of two years prior to the date he claimed blindness, that he had with him at the time of his arrest a manuscript for a Westinghouse project upon which he was working, and the fact that cannot be erased from consideration--driving an automobile and fatally shooting another man with a firearm. The trustees also had the claim for short term benefits claiming mental illness, that he had performed his employment for more than three years after being found legally blind. The trustees also had a complete job description explaining LeFebre's duties and responsibilities.
 
 
 56
 In Horn v. Mullis, supra, we found that to determine whether an action is arbitrary or capricious we must first decide whether it is supported by substantial evidence. The trustees' opinion in this case meets the substantial evidence test.
 
 
 57
 Under the definition of arbitrary and capricious found in Bowman, supra, 419 U.S. at 285, 95 S.Ct. at 441, the reviewing court is to consider whether the decision is based on a consideration of relevant factors and whether there has been a clear error of judgment. The trustees based the decision on information regarding the plaintiff's employment, his duties, his past record, his pay increases, his medical reports and letters explaining the reports and one instance not related to his employment, a homicide. We do not find that the trustees made a clear error of judgment in considering these factors.
 
 
 58
 A trustee has the obligation to guard the assets of the trust from improper claims, as well as the obligation to pay legitimate claims. Under 29 U.S.C. Sec. 1104(a)(1)(B) the trustee is required to act with prudence, skill and diligence "under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Would not a prudent trustee have some question about a claim for disability due to mental and emotional problems immediately after a claimant had killed a man, hired a lawyer and committed himself to a mental hospital? Certainly, a trustee is not overly suspicious in thinking that such a course of action was primarily intended as a defense to the criminal charge. However, Equitable paid over $28,000 in medical expenses for this confinement and $150 per week for six months. The antennae would certainly begin to quiver when the mental illness claim is followed by a claim for total and permanent disability benefits due to blindness alleged to have been total prior to the homicide.
 
 
 59
 Mr. Susarchick testified as to the various factors involved in his decision to deny benefits to the plaintiff. This man had years of experience in handling disability claims. He was concerned by the fact that the accident and sickness claim was for a psychiatric condition and the long term claim for disability as for blindness. He considered the reports of Dr. Susel which stated that LeFebre compensated well for his visual disabilities and was apparently able to perform his usual work functions. He was also aware of the Westinghouse statement that LeFebre had worked until December 1, 1975. Susarchick had reviewed the job description and was aware that over the previous two years LeFebre had received 18 percent in merit pay increases, indicating that he was doing his job satisfactorily, and two months prior to the incident he received an 8.1 percent pay increase. Plaintiff's driving and shooting a gun accurately were also inconsistent with his claim of disability due to blindness.[5]
 
 
 60
 The court stated that it could not "attach much weight" to the pay increases because Westinghouse knew as early as 1973 that the plaintiff was likely to file a disability claim. We find it impossible to follow this line of reasoning. If Westinghouse knew that an employee was going to file a disability claim, which claim would entitle him to 60 percent of his salary, why would Westinghouse increase his salary 18 percent and thereby increase its cost of the anticipated disability claim.
 
 
 61
 In making its finding that the trustees' decision was arbitrary and capricious, the district court relied heavily upon the testimony of Dr. Daniel Finkelstein, a physician specializing in ophthalmology. This physician had considerable experience in treating RP patients, but he did not examine LeFebre until a few days before the trial. He was not hired by the plaintiff's attorneys until a year after the suit was brought. Dr. Finkelstein opined that the plaintiff's vision had diminished from 1972 to 1976, even though he did not see the claimant until 1981. He also found that the plaintiff could not function satisfactorily in his job in 1973 when everything else in the record shows that he was functioning satisfactorily at that time.
 
 
 62
 First, it is important to remember that the testimony of Dr. Finkelstein was never before the trustees.[6] Second, the trial court faulted the trustees for not going out and finding someone like Dr. Finkelstein to support LeFebre's claim for disability benefits. There is no duty on the trustees under these circumstances to look all over Maryland for a doctor whose testimony might contradict the medical reports from reliable physicians that had been submitted. Experience has shown that an "expert" can be found to support almost any position if one searches long enough and pays well enough.
 
 
 63
 It was error for the district court to even consider the testimony of Dr. Finkelstein since it was not before the trustees on the issue of disability, and this is indicative of its retrial of the issues rather than giving it the narrow review directed by Bowman, supra.
 
 
 64
 The district court, relying upon Beggs v. Mullins, 499 F.Supp. 916, 920 (S.D.W.Va.1980) found that the trustees had completely disregarded very persuasive evidence tending to support entitlement and that this was arbitrary and capricious notwithstanding substantial evidence to support the denial of benefits. The district court does not identify the evidence that was completely disregarded or how it was "very persuasive," but faults the defendants for not developing additional information concerning plaintiff's ability to do his job. If any additional information was necessary, it was developed at trial and showed that the plaintiff had the ability and was doing his job in such a way at Westinghouse as to receive salary increases, approval from his superiors and a letter of commendation from the U.S. Navy for his work. The plaintiff had the burden of proof on the issue of whether the trustees acted arbitrarily and capriciously in denying him disability benefits. He has not carried this burden. The denial was based on information compiled by the trustees and supplemented by the plaintiff's attorney. The decision is not "a clear error of judgment," because it is based upon factors relevant to this type of decision making, and it does not contain an erroneous decision on a question of law.
 
 
 65
 The scope of review by the district court of actions taken by trustees under retirement plans is narrow, and a trustee's decision is not to be disturbed unless it is arbitrary and capricious, or is not supported by substantial evidence.
 
 
 66
 Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence". (Citations omitted).
 
 
 67
 Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966).
 
 
 68
 There was substantial evidence to support the defendant's denial of benefits, because substantial evidence supported a finding that he was able to perform his job, in spite of his vision problem, that he was performing his job in a manner acceptable to his employer and that his work product was not only accepted by but praised by one of his employer's best customers, the United States Navy. There was substantial evidence to support a decision that plaintiff was not disabled under the definition of disability contained in the Westinghouse plan. Since the trustees' decision is based upon substantial evidence and is not arbitrary and capricious, we reverse the judgment of the district court.
 
 
 
 *
 Hon. Norman P. Ramsey of the District of Maryland, sitting by designation
 
 
 [1]
 Dr. Susel stated that a person is legally blind when the field of vision is 10? or less or visual acuity is less than 20/200. Since plaintiff had only a 10? field of vision and moderately advanced RP, Dr. Susel found him to be legally blind
 
 
 [2]
 This was a former wife and not the one who survived him
 
 
 [3]
 In a written report dated May 19, 1976 Dr. Susel stated that on February 18, 1976 he found the field of vision to be 10? in each eye
 
 
 [4]
 This interpretation of the doctor's reports was confirmed by Dr. Susel himself at trial when he testified that when he last saw LeFebre on February 18, 1976 "... if anybody had said, can he still do this job, I would say, I would see no reason why he could not do this job based on my examination of him"
 
 
 [5]
 The disability plan did not contain a definition of "blindness". Therefore blindness would be considered as it affected the ability to perform one's regular job or any other appropriate work within the company under the disability definition
 
 
 [6]
 Defendants filed a motion in limine prior to trial in an effort to prevent the testimony of Dr. Finkelstein upon the ground that no reports or testimony of this physician were presented to the trustees