Clifford D. WHIPP

v.

SEAFARERS VACATION PLAN.

Civ. No. Y–84–4449.

United States District Court,
D. Maryland.

April 17, 1986.

W. Michael Pierson, Baltimore, Md., for plaintiff.

Leslie Tarantola, Camp Springs, Md., and Harriet E. Cooperman, Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Clifford D. Whipp brought this action against Seafarers Vacation Plan, alleging that the Plan's denial of his application for vacation benefits was arbitrary and capricious. Whipp claims that the Plan violated the Taft-Hartley Act, 29 U.S.C. § 186, which requires that employee benefit plans be established and administered for the sole benefit of employees. He also claims that the Plan violated 29 U.S.C. §§ 1103, 1104, which require that the assets of an employee welfare and benefit plan be held for the exclusive purpose of providing benefits to participants.

This case was heard without a jury on February 28, 1986, and the following findings of fact and conclusions of law, whether or not so specifically designated, are made herein.

## FINDINGS OF FACT

1. Defendant Seafarers Vacation Plan ("the Plan") is a multi-employer labor-management trust fund, funded through employer contributions, that pays vacation benefits to Seafarers International Union ("SIU") members who work for signatories to collective bargaining agreements with the SIU.

2. In 1951, collective bargaining between signatory employers and the SIU resulted in an Agreement and Declaration of Trust creating the Plan. The Declaration of Trust provided for a 12-member Board of Trustees, composed of six union and six employer representatives. The Trustees administer the Plan, write regulations governing the process of applying for benefits, set eligibility requirements, and determine the amount of vacation benefits to be paid out.

3. The Declaration of Trust is silent as to the purposes of the Plan. Defense witness Carmine Bracco, who has worked on labor relations in the maritime industry for over 40 years and is a long-time Trustee of the Plan, gave uncontroverted testimony that the Plan is intended to serve two purposes: to allow union members to qualify for vacation benefits, and to add incentives that help maintain a stable labor pool for the maritime industry. The Court found Bracco's testimony credible.

4. The Trustees of the Plan traditionally have determined eligibility for vacation benefits by reference to the number of days of "covered employment" within a certain period of time. Covered employment means employment with a signatory to the SIU collective bargaining agreement. The collective bargaining agreement requires signatory employers to contribute a specified amount of money to the Plan for each day worked by an individual employee.

5. Prior to 1978, the Trustees of the Plan required 90 days of covered employment within a 12-month period to qualify for vacation benefits. In 1978, the Trustees changed the requirement to 125 days of covered employment within 12 months in order to prevent students who worked three months during the summer from accruing vacation benefits.

6. In 1981, with the Baltimore maritime industry already sliding into recession, the Trustees liberalized the eligibility standards for vacation benefits, requiring 125 days of covered employment within 15 months. The 15 month period begins to run from the time a union member began employment for which he had not already received vacation benefits. The standard was in place at all times relevant to this litigation.

7. The Trustees of the Plan have also raised the actual amount of vacation bene-

fits significantly and consistently from 1978 to the present.

8. Hiring in the maritime industry is done out of Union hiring halls. Union members are classified into three levels, according to experience. The most experienced have A-books, those second in seniority have B-books, and the least experienced have C-books. When a union member comes off a ship, ending his employment with one employer, he registers for new work at the Union hiring hall. Employers solicit employees for voyages from the Union, and members bid for available jobs twice daily at the hiring hall. A-books always have precedence over B-books, and B-books have precedence over C-books. If two A-books bid for the same job, the person who registered first gets the job.

9. Plaintiff Clifford D. Whipp was a member of the SIU from 1968 to 1983. At all times relevant to this lawsuit, Whipp had a B-book.

10. From January 27, 1981 to August 1, 1981, Whipp worked in covered employment, a total of 140 days. That August he applied for, and received, vacation benefits for those 140 days. Whipp could have waited until March, 1982, to apply for benefits for those 140 days, *plus* any subsequent periods of covered employment up to March 31, 1982. Whipp would not have received interest on the vacation benefits he had already accrued, however, and he testified that he did not consider saving those 140 days because he did not anticipate any difficulties getting rehired and qualifying for vacation benefits again. The Court found Whipp's testimony credible.

11. At first Whipp's confidence in the job market proved well-founded. From November 19, 1981, through March 18, 1982, a total of 121 days, Whipp worked in covered employment aboard the M/V RANGER, owned by Ocean Carriers, Inc.

12. During that time, the SIU collective bargaining agreement required employers to contribute $15.50 to the Plan for each day worked by an individual employee. As a signatory to the agreement, Ocean Carriers, Inc. contributed $15.50 to the Plan for each of the 121 days Whipp worked aboard the M/V RANGER, a total of $1,875.50.

13. Whipp knew that the employer was paying vacation benefits on his behalf, and fully expected to qualify for vacation benefits. But after his voyage on the M/V RANGER, Whipp was unable to obtain covered employment within the necessary 15 month period because of depressed conditions in the maritime industry. The parties stipulated that no jobs were available for one with Whipp's seniority; his break-in-service was completely involuntary, due to no fault of his own.

14. At the end of the 15 month period, Whipp applied for vacation benefits. His application was denied because he had only 121 days of covered employment, four days short of the minimum. The parties stipulated that Whipp exhausted his administrative remedies with the Plan, but the Trustees refused to waive the 125 day requirement in his case.

15. The Trustees of the Plan have administered its eligibility requirements consistently, seldom making special exceptions. The only exception the Trustees make is where a union member was physically unable to work for the required amount of days due to illness or disability. In those cases, the Trustees have awarded *pro rata* vacation benefits for days worked previous to the onset of the illness or disability.

16. The Trustees consult with accountants and actuaries when setting eligibility requirements. There was precious little evidence of the actuarial considerations that led the Trustees to impose the 125 day requirement, or to make exceptions for disabled employees but not for unemployed ones. Carmine Bracco testified that the Trustees made exceptions for the physically disabled as opposed to the unemployed because union members are disabled less often than they are unemployed.

CONCLUSIONS OF LAW

██ Although it is now clear that federal courts have jurisdiction to review claims that trustees, acting under the authority of a 29 U.S.C. § 186(c)(5) trust fund,

arbitrarily and capriciously denied benefits to an employee, *see, e.g., Ponce v. Construction Laborers Trust Fund,* 628 F.2d 537 (9th Cir.1980), two important restrictions limit the Court's review. First, the Supreme Court has held that so long as the terms of collective bargaining agreements do not violate other provisions of federal law, the courts are powerless to review them under the arbitrary and capricious standard. *UMWA Health and Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982). The Court cannot question whether it is arbitrary and capricious to believe that vacation benefits will significantly encourage long-term employment in the maritime industry. Nor can the Court inquire whether it was arbitrary and capricious to establish a vacation plan bureaucracy, currently bleeding off over six percent of revenues, instead of having employers pay vacation contributions directly to their employees in the form of higher wages. Because the collective bargaining agreement left eligibility requirements to the discretion of the Plan trustees, however, the Court can review those requirements in light of the purposes of the Plan.

Second, in a series of recent decisions the Fourth Circuit has emphasized that judicial review under the arbitrary and capricious standard should be sparing. The Fourth Circuit has written that "Trustees of a trust fund enjoy wide discretion in determining eligibility for benefits under their trust," *Dist. 17, Dist. 29, Local Union 7113 and Local Union 6023, UMWA v. Allied Corp.,* 765 F.2d 412, 416 (4th Cir. 1985), *cert. denied,* — U.S. —, 105 S.Ct. 3527, 87 L.Ed.2d 652; the district court is not to "substitut[e] its judgment for that of the trustees," *LeFebre v. Westinghouse Electric Corp.,* 747 F.2d 197, 204 (4th Cir. 1984); "[The arbitrary and capricious standard] exists to ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional," *Berry v. Ciba-Geigy Corp.,* 761 F.2d 1003, 1006 (4th Cir.1985).

In *LeFebre, supra,* 747 F.2d at 204, the Fourth Circuit noted that the decision of the trustees must be upheld if it is supported by substantial evidence, and quoted from *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974):

> Under the "arbitrary and capricious" standard the scope of review is a *narrow* one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a *narrow* one. The court is not empowered to substitute its judgment for that of the trustees." (Emphasis added). (Citation omitted).

Despite this narrow standard of review, courts have been skeptical of eligibility requirements that exclude a disproportionate number of employees, or deny benefits to employees who have worked a substantially greater time than others who received benefits, or retroactively deprive employees of benefits without giving them an opportunity to comply with a new rule. *See, e.g., Harm v. Bay Area Pipe Trades Pension Plan Trust Fund,* 701 F.2d 1301 (9th Cir. 1983), and cases cited at 701 F.2d 1305. Courts have been especially suspicious of eligibility requirements that rob employees of accumulated contributions made on their behalf because of involuntary breaks in service.

> A prerequisite that divests the employee on whose account contributions were made because of an involuntary break in service, and that distributes those contributions to other employees, seems to be at odds with the Congressional intent in enacting the "sole and exclusive benefit" requirement.... Thus, at least where a break-in-service provision deprives an otherwise eligible employee of all benefits derived from substantial contributions made in his behalf, § 302(c)(5) [of the Taft-Hartley Act, 29 U.S.C. § 186(c)(5) ] requires that the defenders of such provision come forward with substantial justification for the stipulation in terms of the Fund's legitimate goals.

*Knauss v. Gorman,* 583 F.2d 82, 89 (3rd Cir.1978) (footnote omitted). *See also* cases cited in *id.,* n. 26; *Robinson v. UMWA Health and Retirement Funds,* 640 F.2d 416 (D.C.Cir.1981), *reversed on other grounds,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982); *Seafarers Pension Fund v. Sturgis,* 630 F.2d 218 (4th Cir.1980) (upholding jury verdict that break-in-service rule was arbitrary and capricious).

While courts have been suspicious of break-in-service clauses that do not distinguish between voluntary and involuntary breaks, they have not found all such clauses arbitrary and capricious. Cases applying the rationale of *Knauss v. Gorman, supra,* and its influential forerunner, *Lee v. Nesbitt,* 453 F.2d 1309 (9th Cir.1972), have gone down separate rhetorical paths.

One path of cases upholding such break-in-service clauses has stressed that *Knauss* and *Lee* "involved break-in-service provisions that operated to divest an employee of benefits he had already fully qualified for otherwise." *Saladino v. I.L.G.W.U. National Retirement Fund,* 754 F.2d 473, 477 n. 4 (2d Cir.1985); *see also Sharron v. Amalgamated Insurance Agency Services, Inc.,* 704 F.2d 562, 568 (11th Cir.1983); *Torrence v. Chicago Tribune Co., Inc.,* 535 F.Supp. 743, 746 (N.D.Ill.1981); *Dudo v. Schaffer,* 551 F.Supp. 1330, 1342 (E.D.Pa. 1982); *Stewart v. Trustees, Masters, Mates & Pilots Pension Plan,* 432 F.Supp. 742, 751 (N.D.Cal.1977). Indeed, the Ninth Circuit's decision in *Lee v. Nesbitt* specifically rejected the argument that a failure to distinguish between voluntary and involuntary breaks was arbitrary without more:

> [Lee] contends that the rule is unreasonable on its face because it also operates whenever a break is involuntary. This contention is too far reaching.... denial of benefits can reasonably be rested upon an insufficiency of years of employment regardless of the reason.

453 F.2d at 1311.

Another path of cases stresses the importance of the voluntary-involuntary distinction. *Van Fossan v. International Broth-*erhood of Teamsters Union Local No. 710 Pension Fund,* 649 F.2d 1243 (7th Cir. 1981); *Giler v. Board of Trustees of Sheet Metal Workers Pension Plan of Southern California,* 509 F.2d 848 (9th Cir.1974). Other cases suggest that "the primary purpose of section 302(c)(5) is to insure that pension benefits are awarded to 'as many intended employees as is economically possible.'" *Ponce v. Construction Laborers Pension Trust, supra,* 628 F.2d at 543, quoting *Gaydosh v. Lewis,* 410 F.2d 262, 266 (D.C.Cir.1969). *See also Elser v. I.A.M. National Pension Fund,* 684 F.2d 648, 656 (9th Cir.1982). In *Johnson v. Botica,* 537 F.2d 930, 935 (7th Cir.1976), the Seventh Circuit stressed the importance of employer contributions made on an employee's behalf, and of the employee's expectation that he would eventually benefit from those contributions.

■ Any perceived differences between these cases are probably the result of disparate fact patterns, and more matters of emphasis and language than disagreements over substantive law. But the differences in emphasis do suggest that a mechanistic approach to break-in-service rules would be inappropriate. Clearly, it would be wrong to interpret *Knauss* as saying that any break-in-service rule that failed to distinguish between voluntary and involuntary breaks was arbitrary *per se.*

■ It would be just as wrong to read cases like *Saladino* to hold that a plaintiff must fulfill some concept of a plan's minimum eligibility requirements before he can obtain judicial review of a break-in-service rule. Such an attempt to limit the rationale of *Lee* and *Knauss* would be artificial anyway. Neither *Lee* nor *Knauss* had fulfilled the minimum eligibility requirements of their plans, or they wouldn't have been in court. If an ineligible plaintiff has worked as long as other eligible employees who are unaffected by the break-in-service rule, that suggests disparate treatment, a factor to be evaluated in terms of the operation and purpose of the plan as a whole.

Under the terms of the plan at issue in this case, an employee who works 75 days for one employer, and 50 days for another,

fulfilling the minimum requirement of 125 total days of covered employment, may not receive vacation benefits if he has a break-in-service between the two employment periods of 15 months. The Plan does not distinguish between breaks-in-service that are voluntary as opposed to involuntary. Further, when an employee suffers an involuntary break-in-service due to illness or disability, he receives vacation benefits for prior covered employment on a *pro rata* basis.

The defendant Plan offered no explanation for the distinction between the involuntarily disabled and the involuntarily unemployed, save for Carmine Bracco's testimony that employees were disabled less than they were unemployed. Under its collective bargaining agreements, the SIU has maintained welfare and pension plans to take care of disabled employees; the vacation plan was not intended to do so, and it is not capable of doing so.

■ In its brief supporting a motion for summary judgment, the Plan argued that the failure to distinguish between voluntary and involuntary breaks-in-service is not arbitrary and capricious because the 125-day rule is consistently applied and financially necessary. The motion for summary judgment was denied. Consistent application, of course, is not an extra plus in defendant's favor, but a required minimum. The courts have always required procedural fairness from the administrators of union trust funds. *See Robinson v. UMWA Health and Retirement Funds, supra,* 640 F.2d at 420, and cases cited at n. 28.

■ Similarly, "financial considerations by themselves should not be sufficient justification for an exclusive eligibility requirement as *every* exclusive eligibility requirement would have the virtue of saving money." *Fase v. Seafarers Welfare & Pension Plan,* 432 F.Supp. 1037, 1041 (E.D.N.Y.1977), *aff'd,* 589 F.2d 112 (2d Cir. 1978). The trustees face an insuperable burden trying to prove that this break-in-service rule was fiscally necessary, because they have the discretion to lower the rates of vacation benefits to correspond with any increases in eligibility.

■ Testimony at trial revealed that the Plan has two purposes: to provide union members with vacation benefits, and to provide incentives for long-term employment in the maritime industry by providing benefits for full-time employees. Evaluating the Plan's break-in-service provision in light of those purposes, the Plan is not benefitting those full-time union members who are unable to find enough covered employment due to depressed conditions in the maritime industry. The Plan thus is violating its obligations to provide benefits to "as many intended employees as is economically possible." *Gaydosh v. Lewis, supra,* 410 F.2d at 266.

If the vacation plan is encouraging union members to stay in the industry during periods when no work is available, the Plan's failure to distinguish between voluntary and involuntary breaks-in-service has nothing to do with it. In fact, that failure may operate as a disincentive. If the Plan distinguished between voluntary and involuntary breaks, an employee with less than 125 days of prior covered employment would have an incentive to make himself available for work during the next 15 months in order to qualify for vacation benefits. Under the current Plan, a employee with a pessimistic view of the job market has no such incentive. "Any incentive to employee loyalty is superfluous in the situation where ... no new employment opportunities exist." *Knauss v. Gorman, supra,* 583 F.2d at 90.

Plaintiff Whipp's circumstances illustrate the inequities of the Plan as it currently operates. During his 121 days of covered employment, Whipp's employer contributed $1,875.50 to the Plan on his behalf. Whipp had been employed in the maritime industry for over 13 years and was precisely the kind of employee the Plan was designed to benefit. After his 121 days of employment ended, Whipp did just what the Plan was supposed to encourage him to do—he made himself available for work, contributing to a "steady pool of labor" for the maritime industry. Through no fault of his own, Whipp was unable to find other covered employment, and thus forfeited any rights

to the considerable sums contributed to the Plan on his behalf. Had he been involuntarily unemployed due to sickness or disability, he would not have forfeited his *pro rata* interest in those contributions.

■ The Plan operates most unfairly during periods of low employment in the industry. Due to maritime hiring practices, only the most senior union members can find sufficient work. Even members like Whipp, with considerable seniority, cannot find enough work to qualify for vacation benefits. As a result, the most senior employees draw a disproportionate share from a pool of vacation contributions enlarged by members like Whipp who do not qualify for benefits. Such discrimination between classes of full-time workers cannot be justified in terms of the Plan's purpose to discriminate against part-time and migratory employees.

■ The Court finds the Plan's failure to distinguish between voluntary and involuntary breaks-in-service to be fundamentally at odds with the purposes of the Plan itself, and therefore arbitrary and capricious. The Plan is directed to pay Whipp a *pro rata* share of vacation benefits, at a new rate calculated to accomodate all other full-time maritime employees similarly situated.