**Clifford D. WHIPP, Plaintiff–Appellee,**

v.

**SEAFARERS VACATION PLAN, Defendant–Appellant.**

**No. 86–3576.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1987.

Decided Nov. 6, 1987.

Harriet Ellen Cooperman (Kaplan, Heyman, Greenberg, Engelman & Belgrad, Baltimore, Md., Leslie Tarantola, on brief), for defendant-appellant.

David Emanuel Pierson (W. Michel Pierson, Baltimore, Md., on brief), for plaintiff-appellee.

Before WIDENER and HALL, Circuit Judges, and SPENCER, District Judge, United States District Court for the Eastern District of Virginia, sitting by designation.

WIDENER, Circuit Judge:

The Seafarers Vacation Plan appeals from a judgment in favor of plaintiff, Clifford D. Whipp, 632 F.Supp. 1487. The Plan contends that the district court erred in holding that the Plan's denial of Whipp's application for vacation benefits was arbitrary and capricious. We agree with the Plan and reverse.

The Plan is a multi-employer labor management trust fund which provides vacation benefits for those members of the Seafarers International Union who work for employers that are signatories to the Plan. The purpose of the Plan is two-fold: (1) to provide employees with vacation benefits and (2) to create incentives for a stable labor pool for the maritime industry by providing benefits for full-time employees.

Prior to the Plan's adoption, it was difficult for employees in the maritime industry to qualify for vacation benefits. This difficulty arose from the fact that seamen were required to work substantial periods of

time for a single employer before they could qualify for vacation benefits. Traditionally, however, maritime employees move from one employer to another at the end of each voyage. This practice caused many such employees to be unable to obtain vacation benefits. Following the establishment of the Plan, a sailor can work with any of the various employers who are signatories to the Plan but still be able to accumulate employment time for vacation benefits.

The Plan is a product of collective bargaining between the Seafarers International Union and the signatory employers. It is governed by written rules and regulations and administered by a twelve member Board of Trustees, composed of six union and six employer trustees. The Trustees, pursuant to the Plan's Agreement and Declaration of Trust, set the eligibility requirements and decide on the amount of vacation benefits to be paid out by the Plan.

The Plan is funded only by daily contributions of signatory employers and whatever investment income these contributions may yield. The daily contributions are based upon the number of employees working at positions covered by the collective bargaining agreements between the Seafarers International Union and the employers. Employer contribution rates are established through collective bargaining. However, no money is deducted from an employee's wages to contribute to the Plan; the employer contribution is exclusive of employee wages.

In order to efficiently administer the Plan, the trustees must necessarily implement eligibility requirements as well as set benefit rates. Decisions regarding these variables are based on the Plan's available finances, the condition of the maritime industry, and the Plan's overall purpose and expectations. The Trustees from time to time review monthly and annual financial statements prepared by accountants to aid them in these decisions. They also consult actuaries, attorneys, and accountants when setting eligibility requirements. This process has enabled the Trustees to effectively apply the Plan to satisfy the needs of the employees and yet allow the Plan to remain solvent.

The method for determining employee eligibility to receive vacation benefits has been a requirement that an employee work a minimum number of days in a specified period. The Plan's initial eligibility rule required a maritime employee to work ninety days within a twelve month period to qualify for vacation benefits. However, in 1978, after summer employees had begun to take advantage of the Plan, the rule was changed by the Trustees. The Trustees determined that vacation benefits to professional sailors, as contrasted to summer help, should be preferred, and since, at that time, steady maritime employment was available to all interested employees, it would serve the interests of the Plan to increase the eligibility requirements. Accordingly, the eligibility requirements for vacation benefits were altered to require 125 days of accumulated employment in a one year period.

In 1981, the eligibility requirements were amended again. At that time, the maritime industry began to experience financial hardship and as a result jobs became increasingly harder to find. In response to this change in industry conditions and the resultant effect on the Plan's resources, the Trustees relaxed the eligibility requirements to enable employees to accrue the required 125 days of employment in a fifteen month, rather than a twelve month, period.

Once this new eligibility requirement was in place for a few years, it became evident that industry conditions were still depressed. Accordingly, effective in 1984, the Trustees again adjusted the Plan's eligibility requirements to require only 120 days of employment within a fifteen month period.

The rates of the vacation benefits paid by the plan are determined by the Trustees. These daily rates may be higher than the daily contributions made for each employee by the signatory employers. For example, in 1981, the daily employer contribution rate for each employee was $15.55 per employee per day worked. However, a

pumpman qualified for a vacation benefit of $24.85 per day and a fireman for $16.27 per day during that year. Thus, there is not a dollar for dollar relationship between the employer contributions on the one hand and the employee benefits on the other.

The plaintiff, Clifford D. Whipp, was a member of the Seafarers International Union from 1968 to 1983. During this period, Whipp received vacation benefits from the Plan on eighteen separate occasions. The total benefits received by the plaintiff on these eighteen occasions exceeded $16,-000.00. Thus, Whipp was thoroughly familiar with both the application process and eligibility requirements of the plan. At all times pertinent to this case, eligibility for the Plan's benefits depended upon Whipp's working 125 days in a fifteen month period since the 1984 amendment had not yet taken effect.

Between January 27, 1981 and August 1, 1981, Whipp worked a total of 140 days for signatory employers. That August he applied for and received vacation benefits based on these 140 days. As the Plan points out, had Whipp waited seven months and applied for benefits at the end of the fifteen month period from January 27, 1981 to March 31, 1982, he would have received benefits for all days worked during that entire period. Instead, the plaintiff decided to cash in his accumulated days at an earlier time after only six months of the fifteen month period had expired.

Between November 19, 1981 and March 18, 1982, Whipp worked a total of 121 days. However, he was unable to accumulate the additional four days of covered employment in order to meet the 125 day minimum eligibility requirement for that fifteen month period. It is readily admitted by both sides that the reason Whipp was unable to obtain the balance of the required minimum covered employment was a combination of the depressed conditions in the maritime industry and Whipp's seniority. At the end of the fifteen month period, Whipp applied for but was denied vacation benefits because he had worked only 121 days during that period.

Whipp thereafter sued in the district court challenging the Plan's denial of vacation benefits. He alleged that the Plan's eligibility requirement was arbitrary and capricious, and the district court found in favor of Whipp. It concluded that the Plan's failure to distinguish between voluntary and involuntary breaks in service was fundamentally at odds with its purpose and, therefore, was arbitrary and capricious. The court observed that the plaintiff had worked for 121 days and that on each of these days his employer made contributions to the Plan on his behalf. Thus, the court ordered the Plan to pay Whipp a pro rata share of vacation benefits, at a newly calculated rate which would take into consideration the fact that the new rate would benefit all other full-time maritime employees similarly situated.

The Labor Management Relations Act (LMRA) provides that it is unlawful for an employer to pay any money or other thing of value to employee representatives. See 29 U.S.C. § 186(a)(1). However, there are exceptions to this general rule. See 29 U.S.C. § 186(c). One of these exceptions allows employers to contribute money to employee trust funds, including vacation plans as involved here. 29 U.S.C. § 186(c)(6).

Federal district courts have jurisdiction to restrain violations of the statute under 29 U.S.C. § 186(e). We have held in the case of a pension plan established under 29 U.S.C. § 186(c)(5) that the standard to be used in reviewing the acts of trustees in the administration of such plans is whether or not they acted arbitrarily and capriciously in their administration. *Seafarers Pension Plan v. Sturgis*, 630 F.2d 218 (4th Cir.1980). Also, in the context of labor and pension agreements in a case involving the administration of a pension disability plan established under ERISA, 29 U.S.C. § 1001, et seq, we defined arbitrary and capricious as used in that context as a narrow scope of review under which courts are not empowered to substitute their judgment for that of the trustees. *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197 (4th Cir.1984). We are of opinion that such

a standard of review should apply in this case, although it arises under § 186(c)(6).[1]

It is clear that while courts may review trustees' actions under an arbitrary and capricious standard, they are not free "to interfere with provisions of agreements freely entered into between unions and employers which regulate day-to-day administrative matters of pension coverage and eligibility." See *Elser v. I.A.M. National Pension Fund*, 684 F.2d 648, 652 (9th Cir. 1982). The trustees of a pension plan have broad discretion in setting eligibility rules. *Elser*, 684 F.2d at 654. With these standards of review in mind, we examine the holding of the district court.

In its decision, the district court found that the Plan's failure to distinguish between voluntary and involuntary breaks in service rendered it arbitrary and capricious. The district court concluded that the Plan worked most unfairly during periods of low employment in the industry because "the most senior employees draw a disproportionate share from a pool of vacation contributions enlarged by members like Whipp who do not qualify for benefits." Thus, the district court was of opinion, and ruled, that the employees who failed to qualify for vacation benefits under the Plan should be paid a pro rata share of vacation benefits, at a new rate calculated to accommodate them.

If we were in the position of the Trustees, and were required to initially determine the eligibility requirements of the Plan, we might agree with the district court's reasoning.[2] It is not our task, however, to substitute our judgment for that of the Trustees. *LeFebre*, 747 F.2d at 204. And this rule applies equally to the district courts. For, as this circuit has already recognized, this limited exercise of judicial review "exists to ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional." *Berry v. Ciba–Geigy Corp.*, 761

F.2d 1003, 1006 (4th Cir.1985). The question, therefore, is not whether the adopted requirements are the best conditions' precedent for eligibility for benefits. Rather, the issue presented is whether those requirements are arbitrary and· capricious. *LeFebre*, 747 F.2d at 204.

As Whipp concedes, break-in-service rules are not arbitrary and capricious per se. See *Sailer v. Retirement Trust Fund*, 599 F.2d 913, 914 (9th Cir.1979). Moreover, any eligibility scheme which creates categories of time and service requirements is at least to a limited extent inherently arbitrary. This is simply due to the need for "establishment of a positive line of demarcation separating the eligible from the non-eligible." *Roark v. Lewis*, 401 F.2d 425, 428 (D.C.Cir.1968). Since Whipp points to no aspect of the break-in-service rule which is· inherently arbitrary and capricious, he must rely on some other factor to sustain ·his case.

He so contends that arbitrariness is demonstrated by the inequitable distribution of funds contributed on his behalf to his more senior co-employees. However, as the Eleventh Circuit has pointed out in the pension context:

It is impossible, of course, to ascertain at the establishment of a fixed contribution type employee benefit plan what precise payments will be available for distribution to beneficiaries at some future date. The level of those payments can be established with certainty only by reference to general economic conditions, investment yields, the relative strength of a particular established fund, and the actual and projected levels of demands made upon the fund for payments at any specific time. Because of this confluence of complex economic considerations, trustees of a fixed contribution trust fund must, in most circumstances, be accorded some discretion in determining questions of eligibility and the precise

---

**1.** The parties and the district court apparently have treated this plan as one created under 29 U.S.C. § 186(c)(5). We think, however, the plan is provided for in § 186(c)(6) which exemption

is for, among other things, "... pooled vacation, holiday, severance or similar benefits...."

**2.** We do not intimate, however, that the Trustees' actions are to be criticized.

contours of benefits to be awarded. *Sharron v. Amalgamated Insurance Agency Services, Inc.*, 704 F.2d 562, 564 (11th Cir.1983) (quoting *Bricklayers, Masons and Plasterers International Union of America, Local Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1026 (5th Cir.1975) (citations omitted)).

This language has application to the case at hand. The rates of vacation benefits are higher than the daily contributions made on behalf of each employee by the signatory employers. With the exception of investment income, employer contributions are the Plan's sole source of funding. Therefore, it is the responsibility of the Trustees to administer the Plan in a way that will insure that employer contributions are able to cover future benefit payments. The Trustees accomplish this goal by adjusting the benefits' rate and the eligibility requirements, and this they do on the advice of professional actuaries and accountants. The fact that the Trustees have taken into account such factors as depressed industry conditions and the legitimate goal of their fund is evidenced by their actions from time to time in raising and lowering the eligibility requirements in response to industry conditions and demands on the fund. This is substantial evidence which tends to show that the Trustees have acted in accordance with the Plan's goals of allowing professional sailors to qualify for benefits. Nothing to the contrary is shown.

We think that Whipp's attack on the Plan as administered can be reduced to this: he complains that the amount of vacation benefits to other more senior employees is inflated by a distribution of funds contributed on his behalf. He loses sight of the fact that his eighteen withdrawals from the fund were financed in part by contributions from employees junior to him or with disqualifying breaks in service. He also loses sight of the fact that the Trustees' administration of the Plan need not be perfect; rather, the requirement is that it not be arbitrary and capricious. On this record, we are unable to affirm the conclusion of the district court that it was.

Accordingly, the judgment of the district court is

REVERSED.