**Ralph BLOCK, Plaintiff,**

v.

**PITNEY BOWES INC., et al.,
Defendants.**

**Civ. A. No. 87–2618.**

United States District Court,
District of Columbia.

Jan. 3, 1989.

Edward N. Leavy, Marya C. Young, Jones, Mack, Delaney, Young & Leavy, Washington, D.C., for plaintiff.

Peter Chatilovicz, Deborah A. Folloni, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., for defendants.

## OPINION AND ORDER

REVERCOMB, District Judge.

The only remaining issue in this case is a claim under the Employee Retirement Income Security Act[1] (ERISA) challenging defendants' decision to deny plaintiff, a former employee of Pitney Bowes, benefits under Pitney Bowes' Long Term Disability Plan ("Plan"). Defendants have moved for summary judgment and plaintiff has opposed the motion. Oral argument was

1. Codified as amended at scattered sections of 29 U.S.C.

heard on December 8, 1988. The Court grants the motion and enters judgment in favor of defendants.

### I. Facts Not in Dispute

Plaintiff was employed as an area sales representative for defendant Pitney Bowes Inc. Defendants' Facts ¶ 6. In his job, he was often required to carry equipment and other sales tools to customers and prospective customers; his job also involved a considerable amount of walking. Facts ¶¶ 7–9. While carrying heavy equipment to a client meeting in Washington, D.C., on October 12, 1983, plaintiff states that he tripped on a sidewalk and fell on his right leg, injuring it. Facts ¶ 10; Deposition of Plaintiff at 45–46. He suffered a severed hamstring pull and his medical treatment included arthroscopic surgery. Levine Affidavit ¶ 6.

Based on information received from Dr. David Johnson, an independent orthopedic surgeon who examined plaintiff, Pitney Bowes' medical director advised the company on March 30, 1984 that plaintiff could return to work with restrictions—namely "4 hours standing—4 hours sitting—limited walking." Facts ¶ 14. Pitney Bowes notified plaintiff on April 6, 1984, that it was placing him on leave of absence because the company did not have a position that would accommodate his medical condition. Facts ¶ 15.

Plaintiff applied on April 23, 1984, for benefits under Pitney Bowes' Long Term Disability Plan. The Administrative Committee of the Plan ("Committee") on May 29, 1984 approved plaintiff's application for long term disability benefits because plaintiff was scheduled to undergo surgery. The benefits were to be given retroactively from April 1, 1984, and were to continue until August 31, 1984. Facts ¶ 17.

In September 1984, Dr. Johnson sent a report to Pitney Bowes on plaintiff's condition. The report stated, among other findings, that on the job plaintiff could sit for eight hours a day, walk intermittantly for two hours, lift intermittently for four hours, bend intermittently for four hours, but could not squat, climb, or kneel at all. Facts ¶ 19. Plaintiff was found able to drive on the job and able to work an eight-hour day. Id. The doctor stated that he could not yet determine whether plaintiff was permanently disabled. He also stated, however, that plaintiff could not return to his old job, although he could return to the work force through "selective placement." Id.

The medical director for the Plan advised the Plan's administrators on September 21, 1984 that Mr. Block be terminated from the Plan because he was not "totally disabled." Facts ¶ 20. The Committee notified plaintiff on October 1, 1984 that he was no longer eligible for long-term benefits because medical examinations showed he was not "totally disabled" as defined by the Plan and that he could work with certain restrictions. Facts ¶ 22. Plaintiff also was informed that he was being placed on leave of absence since Pitney Bowes had no jobs available that were suited for him. Facts ¶ 24.

Plaintiff appealed the termination of his benefits under the Plan and submitted reports from additional doctors, one of whom stated, among other things, "I don't see how he can be returned to work and I do not forsee that to happen in the future." Defendants' Exhibit 1, attachment 4. The Committee denied his appeal, and later denied a second and third appeal, each on the ground that plaintiff was not eligible for benefits under the Plan because he was not "totally disabled." Facts ¶¶ 27–35.

On July 25, 1985, Pitney Bowes informed plaintiff that it was terminating his employment as of July 23, 1985, due to the fact "that we cannot accommodate your physical restrictions and your present leave has been extended far beyond the normal considerations." Defendants' Exhibit 4.

### II. The Terms of the Plan

The only significant issue remaining in this case is whether the Committee properly terminated plaintiff's benefits under the Plan. To be eligible for benefits, an employee must be "Totally Disabled." Plan § 5.1. An employee is "totally disabled" when he is

unable, because of injury or illness, to engage in any gainful occupation or profession for which he is reasonably fitted by education, experience, capability or training, except approved Rehabilitative Employment, as determined by the Committee on the basis of periodic medical examinations.

Plan § 2.19. The term "Rehabilitative Employment" is defined as "any occupation or employment of the [employee] for wage or profit while, as a result of injury or illness, the [employee] is unable to fully perform the duties of his occupation." Plan § 2.17. An employee is entitled to benefits until he has recovered from his "total disability." Plan § 5.1.

*III. The Law*

Under Federal Rule of Civil Procedure 56(c), a Court must grant summary judgment if there is no "genuine issue of material fact" and if "the moving party is entitled to summary judgment as a matter of law." Because the Court believes that the only issue of significant dispute between the parties is over the interpretation of the provisions of the Plan, the Court concludes that summary judgment is appropriate in this case.

Most federal appellate courts have ruled that a court reviewing a decision of a plan's trustees under ERISA may overturn the decision only if it is found to be arbitrary, capricious, made in bad faith, or made in derogation of law. *See, e.g., Miles v. New York State Teamsters Conference,* 698 F.2d 593, 599 (2d Cir.1983); *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 313–14 (5th Cir.1982). The District of Columbia Circuit follows this standard. *See, e.g., Holt v. Winpisinger,* 811 F.2d 1532, 1535 (D.C.Cir.1987); *Danti v. Lewis,* 312 F.2d 345, 348 (D.C.Cir.1962). Although this is a narrow standard of review for the Court, the Court must determine whether the trustees' decision was supported by sustantial evidence. *Danti,* 312 F.2d at 348. The key to the arbitrary and capricious standard is that if there is more than one action that is considered "reasonable," the Court must not overturn a decision that is found to be reasonable, even if an alternative

decision also could have been considered reasonable. *See Stewart v. National Shopmen Pension Fund,* 795 F.2d 1079, 1083 (D.C.Cir.1986). Moreover, a reviewing court must determine whether the trustees' actions were reasonable at the time they were made and must not conduct a *de novo* factual determination of whether the employee is entitled to the benefits. *See, e.g., Berry v. Ciba–Geigy Corp.,* 761 F.2d 1003, 1007 (4th Cir.1985).

Not all courts have adopted the arbitary and capricious test, however. The United States Court of Appeals for the Third Circuit, for example, recently held that denial of benefits by a pension plan's administrators should be reviewed under the principles governing construction of contracts between parties bargaining at arm's length. *Bruch v. Firestone Tire and Rubber Co.,* 828 F.2d 134, 145 (3d Cir.1987). The contractual analysis test was preferred by the Third Circuit in part because it concluded that the trustee was not disinterested in the amount of benefits awarded under the plan. *Id.*

Although the Court in the instant case follows the arbitrary and capricious standard as specified by the Court of Appeals for the District of Columbia Circuit, the Court believes that the outcome of this case is the same under either test. Using either the arbitrary and capricious standard or the tougher standard of contractual analysis, the Court concludes that defendants were justified in denying plaintiff benefits under the Long Term Disability Plan and that defendants are entitled to summary judgment.

*IV. Conclusions*

A. Interpreting the Plan

█ In reviewing defendants' actions the Court naturally must first look to the language of the plan itself, although the weight the Court attaches to the plan's language may vary according to the degree of support for the actions that can be found in the plan provisions. *Donovan v. Carlough,* 576 F.Supp. 245, 249 (D.D.C.1983), *aff'd mem.,* 753 F.2d 166 (D.C.Cir.1985).

The chief point of contention in this case is whether plaintiff was "totally disabled" —and thus entitled to benefits under the Plan—simply because he was unable to return to his old job, or whether he was *not* "totally disabled" because he was considered able to perform other jobs for which he was reasonably fitted by his experience and training. The Court concludes that the latter construction, advocated by defendants, was the appropriate reading of the Plan's provisions.

Plaintiff argues a number of points in an attempt to defeat defendants' clear and simple interpretation of the Plan's provisions. Plaintiff maintains that the administrators' interpretation was 1) contrary to the language of the relevant provisions, 2) inconsistent with other provisions, and 3) and not in line with the purposes of the Plan. The Court concludes, however, that the administrators' interpretation of Plan was both justified and thoroughly consistent with the language, purposes, and spirit of the Plan.

Plaintiff argues that the definition of "totally disabled" should be read to include any employee who cannot fully perform the duties of his previous job. Plaintiff's Opposition at 16–17. Plaintiff reaches this conclusion by noting the express inclusion in the definition of "totally disabled" of those employees engaged in "approved Rehabilitative Employment." Plan § 2.19. The latter term is defined as "any occupation or employment of the [employee] ... while ... unable to fully perform the duties of his occupation." Plan § 2.17. If employees who work at "rehabilitative employment" are considered "totally disabled," then any employee who can no longer work at his old job must be considered "totally disabled," plaintiff apparently concludes.

The Court, however, disagrees with plaintiff's argument and agrees with that of defendants, who maintain persuasively that plaintiff's interpretation of the Plan is contradicted by both the plain language and the reasonable interpretation of the Plan's provisions. Defendants point out that the "rehabilitative employment" clause was included in the "totally disabled" definition so as to not exclude from that definition an employee who meets the first part of the "totally disabled" definition—"unable ... to engage in any ... profession for which he is reasonably fitted"—but who nonetheless takes some minor, short-term job during his *rehabilitation* for his old job. Defendant's Reply at 7–9. Indeed, the fact that the employment is termed "rehabilitative" employment helps prove that the term was meant to cover only a small number of employees who otherwise cannot work at a job to which they were fitted but who nonetheless are being rehabilitated for their old jobs.

It is not reasonable to accept plaintiff's interpretation, which would read the Plan's provisions so as to cover any and all employees who are unable to perform their old jobs. The Plan makes clear that an employee must first be totally disabled to engage in approved rehabilitative employment, which entitles the employee to have his disability benefits offset only by 60% of his rehabilitative income and only for up to 24 months. Plan § 5.8. The Plan does not state that working at rehabilitative employment entitles the employee to be considered "totally disabled." Indeed, if the Plan were intended to mean what plaintiff argues it means, a "totally disabled" employee could simply have been defined as any employee who is "unable, because of illness or injury, to perform his previous job." [2]

In sum, the Court concludes that the Plan's administrators were not arbitrary and capricious in interpreting the Plan in the way that they have. Alternatively, using a contract analysis method of review, the Court similarly would conclude that the Plan should be interpreted in the way it was interpreted by the Plan's administrators.

Once it is accepted that "totally disabled" does not include all employees who

---

**2.** Disability plans may contain a provision stating that the employee is entitled to benefits if he cannot perform his old job. *See, e.g., LeFebre v.* *Westinghouse Electric Corp.,* 747 F.2d 197, 201 (4th Cir.1984).

are unable to return to their old jobs, it is a small step to the conclusion that plaintiff was not "totally disabled." Medical evidence showed that plaintiff, while unable to return to a sales job that involved much carrying, bending, or lifting, could work at a sales position that involved desk and telephone work, some walking, driving, and visiting with clients. Defendant's Exhibit 5, attachment 1. Moreover, the findings of doctors other than Dr. Johnson did not significantly depart from the crucial findings of plaintiff's treating physician. It is clear to the Court that plaintiff was able to perform a job "to which he is reasonably fitted by education, experience, employment, capability, or training," and that the Plan's administrators were correct in concluding that plaintiff was not "totally disabled" and thus not eligible for benefits under the Long Term Disability Plan.

### B. Other Allegations

In addition to his disagreement with defendants over the interpretation of the Plan's provisions, plaintiff maintains that the Plan's administrators treated plaintiff improperly by 1) failing to advise Mr. Block about or provide him with alternative or rehabilitative employment, 2) denying his appeals without proper consideration of additional medical evidence or selectively misstating that evidence, 3) failing to provide him with the specific reasons for its decisions, and 4) terminating his employment despite the fact that plaintiff had not failed or refused to return to work. The Court concludes that none of these allegations has merit, either factually or legally, and that plaintiff has failed to support them sufficiently to withstand the documentation presented by defendants in favor of summary judgment.

■ As to the claim that defendants failed to find plaintiff suitable alternative employment, it is clear that there is no provision under the Plan or elsewhere that required defendants to find plaintiff or advise him about an alternative job. When a

plan does not specifically state that the employer has the duty of ensuring the availability of an alternative job, the court cannot impose such a requirement. *Jestings v. New England Telephone & Telgraph Co.*, 757 F.2d 8, 11 (1st Cir.1985).

The Court also finds that there is no support for the allegation that the Plan's administrators failed to consider adequately all the medical documentation provided. Defendant presented unrefuted affidavits that all of the medical evidence was considered. Defendants do state that, throughout their handling of the case, the administrators relied most heavily on the conclusions of Dr. Johnson, who was plaintiff's treating physician, and who examined plaintiff approximately 20 times. This reliance on the opinion of the treating physician was both sensible and supported by law. *See Hensley v. WMATA*, 655 F.2d 264, 273 n. 13 (D.C.Cir.1981), *cert. denied*, 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed.2d 160 (1982).

■ The charge that defendants failed to provide plaintiff with the specific reasons for the denial of benefits and adverse rulings on appeal is likewise without merit. Regulations under ERISA require the employer to state the reasons for its actions. 29 C.F.R. § 2560.503–1(f). After reviewing the correspondences from defendants to plaintiff, the Court concludes that defendant *did* provide adequate notice of the reasons for its actions. Defendant notified plaintiff on October 1, 1984, that, based on medical evaluations, plaintiff was not "totally disabled" since he could work at a job with certain restrictions.[3] Subsequent correspondences indicated that defendants continued to stand by their intitial conclusions with regard to plaintiff's eligibility. Defendants' Exhibit 1.

Finally, the Court finds no merit in plaintiff's claim that he was improperly terminated as an employee of Pitney Bowes and

---

**3.** Assuming for the sake of argument that defendants did violate the notice regulation, the Court since concludes that defendants are still entitled to summary judgment, because plaintiff suffered no prejudice. *See Hancock v. Mont-*

*gomery Ward Long Term Disability Trust*, 787 F.2d 1302, 1306–07 (9th Cir.1986). Plaintiff was and is aware of the reasons why he was denied benefits.

that Pitney Bowes acted in bad faith. Plaintiff provided no support for this allegation and failed to refute defendants' statements that plaintiff was fired because Pitney Bowes had no job available for plaintiff. Bald, unsupported allegations of "bad faith" cannot withstand a motion for summary judgment. *See, e.g., Locke v. Commercial Union Insurance Co.,* 676 F.2d 205, 206 (6th Cir.1982).

In sum, the Court concludes that defendants acted reasonably and legally in determining that plaintiff was not eligible for benefits under the Long Term Disability Plan and concludes that defendants are entitled to summary judgment.

Accordingly, this 3rd day of January, 1989, it is

ORDERED that defendants' motion for summary judgment is GRANTED.