Noel STEEVER, Plaintiff,

v.

BRISTOL–MYERS COMPANY, et al., Defendants.

Civ. A. No. HAR 88–3075.

United States District Court, D. Maryland.

Nov. 6, 1989.

◉⟶31

George W. White, Jr., Towson, Md., for plaintiff.

E. Fremont Magee, Piper & Marbury, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

HARGROVE, District Judge.

Currently pending before this Court is Defendants Bristol–Myers Company's ("Bristol–Myers") and William F. Flatley's ("Flatley") Motion for Summary Judgment. The issues have been fully briefed. No hearing on this motion is deemed necessary. Local Rule 105.6.

### I.

In June, 1979, Steever became employed by Bristol–Myers in its United States Pharmaceutical and Nutrition Group, Mead Johnson, as a sales representative. Her duties in this position required her to do extensive driving and repeated lifting of packages weighing in excess of 20 lbs.

In 1985, Steever began experiencing back and neck pains. She was referred to Dr. Robert C. Abrams, an orthopedic surgeon, who diagnosed her as having cervical disc degenerated disease. Because of her illness, her ability to work was physically restricted. She could no longer perform her job as a sales representative for Mead Johnson Division of Bristol–Myers.

In July, 1985, she was placed on short-term disability status under the "Bristol–Myers Company Long–Term Disability Income Plan" ("Plan"). The Plan is an employee benefit plan as defined by 29 U.S.C. Section 1002(3) of the Employee Retirement Income Security Act of 1974 ("ERISA").

Steever later applied for long-term disability status pursuant to the Plan. In order to obtain long-term disability, it is necessary to be found "totally disabled" under the Plan. The Plan defines "total disability" as:

> 1.16 "Totally Disabled" or "Total Disability" means (a) during the first year of a Participant's disability, that the Participant is unable to perform each and every duty pertaining to his own occupation and is not engaged in any other occupation, and (b) thereafter, that the Participant is unable to engage in any occupation for which he is qualified by education, training and experience.

Defendant Bristol–Myers' Exhibit A, Paragraph 1.16.

The Plan Administrator determines if a participant qualifies as totally disabled. Defendant's Exhibit A, Paragraphs 5.1, 6.1. Under the Plan, a participant who becomes totally disabled receives two-thirds of his "monthly base earnings," reduced by other income. Defendant's Exhibit A, Paragraph 3.1(b). Monthly base earnings are determined by the employee's salary at the time he became totally disabled. Exhibit A, Paragraph 3.1(c). A participant would be considered totally disabled until such time as he is able to earn more than his disability payment. While on disability, Steever

received payments of $973.04 twice monthly, or $23,352.96 annually.

On March 10, 1986, Steever was determined to be totally disabled under paragraph 1.16(a) of the Plan since she could not perform "each and every duty" required under her job as sales representative of Mead Johnson. This entitled her to receive long-term disability benefits for one year. She continued on long-term disability until October 21, 1987, when she was notified by Bristol–Myers that she was no longer considered totally disabled under paragraph 1.16(b) of the Plan. Her benefits were then terminated, although Bristol–Myers did offer to arrange and pay for vocational rehabilitation services. This offer was denied by Steever. An appeal by Steever of the Administrator's decision was denied in March, 1988.

Steever then sued Bristol–Myers in Maryland state court. Bristol–Myers removed the case to this Court claiming jurisdiction under both diversity, 28 U.S.C. Section 1332, and the federal question presented by this ERISA claim. The complaint was later amended to name Flatley, the Plan Administrator and named Fiduciary, as a co-defendant.[1]

## II.

A threshold question raised by the pleadings is the standard of review that this Court will employ over the decision of the Plan Administrator to deny Plaintiff's benefits. In the past, the Fourth Circuit had limited district court review of the decisions of ERISA plan administrators to determine only if they had acted arbitrarily or capriciously, i.e., whether his decision is supported by substantial evidence. *Voliva v. Seafarers Pension Plan*, 858 F.2d 195, 196 (4th Cir.1988); *Richards v. United Mineworkers Health and Retirement Funds*, 851 F.2d 122, 123 (4th Cir.1988); *Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1006–07 (4th Cir.1985). Such review is narrow. "[W]e may not substitute our judgment of the facts in this case for that of the Trustees, for it is the Trustees whose expertise in this area arises from daily and continual experiences." *Richards*, 851 F.2d at 123. Steever, claims that this Court should exercise *de novo* review under the recent Supreme Court decision in *Firestone Tire and Rubber Company v. Bruch*, —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Court does not read *Firestone* as changing the standard of review to be employed in this case, however.

In *Firestone*, the Firestone Tire and Rubber Company had sold its plastics division to Occidental Petroleum. At the time, Firestone maintained a termination pay plan for its employees. Like the Bristol–Myers plan before this Court, Firestone's termination pay plan was an employee benefit plan as defined by 29 U.S.C. Section 1002(3) of ERISA. Occidental rehired most of the approximately 500 salaried employees in the plastics division following its purchase. Still, several employees who were retained by Occidental following its acquisition filed for termination benefits from Firestone. Their benefits were denied by the Plan Administrator who found that the sale of the plastics division did not constitute a "reduction in work force" under the termination plan. *Id.*, 109 S.Ct. at 951. *See also Parsons v. West Virginia Works Hourly Employees Pension Plan*, 879 F.2d 130 (4th Cir.1989) (determination by administrator as to who is a "participant" under an ERISA plan is given *de novo* review).

In *Firestone*, the Plan Administrator was interpreting the meaning of a clause in the benefit plan itself. Recognizing that this is not the sort of determination generally within the discretion of plan administrators, the Supreme Court ordered the district court to exercise *de novo* review. In this situation, *de novo* review is both necessary and proper. Administrators do not have the experience which courts possess in interpreting contractual provisions. This is not an area in which an administra-

---

1. On September 25, 1989, Steever filed a Motion requesting a second leave to amend her complaint in order to name the Plan as an additional defendant. This Motion was filed almost a year after removal and two months after the motions deadline. Accordingly, it was denied on October 20, 1989.

tor develops expertise from his usual duties. Hence, *de novo* review is mandated.

This is totally distinguishable from the situation presented to this Court. Here, the Plan administrator made a decision plainly within his authority as expressed in the Plan itself. Paragraph 5.1 of the Plan states that he "shall have the authority to grant or deny all claims for benefits under the Plan." Defendant's Exhibit A, Paragraph 5.1. Paragraph 6.1 also expressly establishes this authority:

The authority and responsibilities of the Plan Administrator, in addition to those provided elsewhere herein, are: (a) to grant or deny Participants' claims for benefits under the Plan....

*Id.,* Paragraph 6.1. Decisions concerning pension benefits are exactly the type in which administrators gain expertise from "daily and continual experiences." *Richards,* 851 F.2d at 123.

■ Steever claims that the authority exercised by the Plan Administrator is not "discretionary" and thus under *Firestone* must be reviewed *de novo.* This argument is totally without merit. It is incomprehensible to conclude that the administrator is granted "the authority" under the Plan but does not have "discretion." The fact that the instrument does not include the word "discretion" in its enumeration of the administrator's responsibilities in this area while it does use the word elsewhere does not mean that discretion does not exist. Such a distinction is unworkable. It would be impossible for a plan administrator to exercise any authority in granting or denying benefits without exercising discretion. This is not the type of situation which the Supreme Court has directed the courts to review *de novo. Boyd v. Trustees of United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59 (4th Cir.1989). Accordingly, the Court will limit its review to whether the administrator acted arbitrarily or capriciously as directed by the Fourth Circuit. *Voliva, supra; Richards, supra.*

### III.

■ Summary judgment will be granted when "there is no genuine issue as to any material fact, and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. The mere existence of a "scintilla of evidence" is not enough to frustrate a motion for summary judgment. The pleadings must show evidence on which the finder of fact could reasonably find for the party opposing judgment. *Id.,* 477 U.S. at 252, 106 S.Ct. at 2512; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ In deciding whether the actions of the Plan Administrator were arbitrary or capricious, this Court will review only those facts available to the Plan Administrator at the time of his decision. *Voliva,* 858 F.2d at 196. After reviewing the facts available at the time of termination, this Court is satisfied that the actions of the Administrator are supported by substantial evidence and that there was no abuse of discretion.

After Steever was placed on disability in 1986, the Plan requested that she submit a statement of disability from her physician. In response, her physician, Dr. Robert C. Abrams, sent a report dated November 4, 1986. This report stated that Steever could not use her arms for anything more than minimal activity and that she would require rehabilitation and special training for a job without physical activity. However, his report concluded that "[p]atient could continue to work if all lifting and use of arms for anything other than the most minimal stress were eliminated." Defendant's Exhibit E.

Steever has a real estate license, a degree in business from the College of Notre Dame, and has a solid work history. Defendant's Exhibit K. In January, 1987, a rehabilitation consultant submitted a report to the Plan which targeted three positions for her in light of her physical limitations, background and interest. These were Real Estate Agent (est. annual salary, $20,000–$40,000), Mortgage Loan Officer ($25,000–

$50,000), and Public Relations Specialist ($21,000–$40,000). Still, the report recognized that she could only work 20 hours per week at that time, "to increase as tolerated." Real Estate was the only position listed by the consultant which offered part-time work. Defendant's Exhibit F.

On April 28, 1987, another physician, Dr. Martin Z. Kanner, examined Steever as required in Paragraph 4.3(h) of the Plan. Dr. Kanner at that time concluded that he believes that there is "no reason ... that [Steever] could not perform work that does not entail repetitive lifting or excessive traveling." He mentioned no limit to the number of hours that she could work. He did recognize that prior to continuing work after a two-year layoff that Steever would need to undergo a "work hardening program." Defendant's Exhibit G.

In light of this recommendation, the Plan informed Steever that she should begin working with a rehabilitation specialist at Plan expense to assist her in returning to the workforce. Additionally, she was assured that during rehabilitation she would retain all of her benefits. Defendant's Exhibit H. This offer apparently was rejected.

In July, 1987, the Plan arranged for Steever to be seen by another orthopedic expert, Dr. Rafael Alfonso. Dr. Alfonso submitted a report to Bristol–Myers on August 18, 1987. In this report, Dr. Alfonso found that:

> [Steever] is not totally impaired in performing her duties provided that she is allowed not to lift over 20 pounds and of course her limitation as to driving [is] understood.... I feel she can in fact do a less strenuous [sic] job than she has been advised to perform. I do feel that

she has reached maximum improvement to the point that no further treatment is necessary.... I do feel that she will probably be able to return to some gainful occupation within the same company if such a job would be provided to her.

Defendant's Exhibit I. Again, the report does not state that Steever's disability would limit her to part time work. Relying on this report and the report of Dr. Kanner, the Plan concluded that Steever was no longer totally disabled. Accordingly, it sent a letter on October 21, 1987 notifying her that her benefits were being terminated. The letter also renewed the Plan's offer to provide her with rehabilitation service until May 15, 1988 and also informed her that her health care benefits would be continued until this same date. Defendant's Exhibit J.

Thereafter, Steever appealed this decision to the Plan Administrator who is designated by the Plan itself as the Senior Vice–President of Human Resources for Bristol–Myers.[2] Along with the appeal, she supplied an additional medical report from Dr. Abrams. In his letter of November 3, 1987, he stated that an examination of Steever "revaled [sic] that she had a full range of motion [in her neck] except for right and left lateral bend. These were restricted 20° and were mildly painful. Examination of her upper extremeties was completely normal and she was vaguely tender over both trapezius muscles." Defendant's Exhibit N. Despite this encouraging diagnosis, only one week later Dr. Abrams wrote an addendum to the report indicating his belief that Steever would "require a surgical procedure on her cervical spine in order to get ... back to gainful employment." Defendant's Exhibit O.[3]

---

**2.** According to Bristol–Myers, Steever selected another doctor, Dr. Otenasek, to give a second opinion on her condition prior to appealing the denial of benefits. Bristol–Myers claims that Dr. Otenasek stated that Steever was not totally disabled. Apparently, Steever did not report the existence of Dr. Otenasek's diagnosis to the Plan. Bristol–Myers requests that this Court consider this opinion in reviewing the ruling of the administrator. However, since the Court is reviewing the decision of the administrator to determine arbitrary and capricious behavior only, we are constrained to consider "only the

record before the administrator at the time it reached its decision." *Voliva*, 858 F.2d at 196. If the Court believes that the Administrator needs evidence unavailable at the time of his decision, the proper course would be to "'remand to the trustee for a new determination.'" *Berry*, at 1007 (citation omitted).

**3.** Dr. Abrams later admitted in deposition that there are some occupations which Steever could perform, notwithstanding her physical condition. He further stated his belief that Plaintiff asked him to write the addendum to the report.

Still, in a follow-up letter sent by Dr. Abrams to the Plan on January 27, 1988, he admitted that "there are some jobs that she could do...." Defendant's Exhibit R.

Based upon the information available to the Plan, it denied Steever's appeal. Steever was notified of this by letter dated March 18, 1988.

In light of the available evidence, this Court finds that the actions of the Plan were clearly supported by substantial evidence. Accordingly, the Court will not disturb the decision of the Administrator. *Richards*, 851 F.2d at 123–24; *LeFebre v. Westinghouse Electric Corp.*, 747 F.2d 197, 204 (4th Cir.1984).

### IV.

Steever further argues that she received insufficient notification of the reasons for the denial of benefits under the standards set forth in ERISA. It is claimed that the Plan failed to provide her with specific reasons for the denial and made no reference to her ability to engage in gainful employment at comparable pay.[4] This is not true. Both the letter which initially terminated her benefits and the letter which informed her of the denial of her appeal specified that based upon the medical records she was no longer considered totally disabled. They also referred to her background, training, and education, and concluded that there are a number of occupations in which she could perform. It is hard to imagine what more the Plan could have told her without actually providing her with a new job.

Furthermore, even if this notice did not specifically identify all of the reasons for

the termination of her benefits and the subsequent denial of her appeal, the Court finds that Steever was well aware from the compilation of reports and correspondence over the two-year period of the reasons for her denial. *See Block v. Pitney–Bowes, Inc.*, 705 F.Supp. 20, 24 (D.D.C.1989). Therefore, there is no violation of the notification requirements of ERISA, 29 C.F.R. Section 2560.503.1(f)–(h).

For the foregoing reasons, Defendant Bristol–Myers' Motion for Summary Judgment is granted. It will be so ordered.

---

*See* Defendant's Exhibit P. This information was not available to the Plan when it terminated her benefits and denied her appeal. Therefore, the Court does not consider this in making its review of the actions of the Defendants. *Voliva, supra.*

4. Steever points to a document entitled "Long-Term Disability Plan Highlights" to argue that she could not be terminated by the Plan unless "the Company determines ... that you are no longer disabled from your own job or any *comparably paid job* for which you are qualified based upon training, education or experience." Plaintiff's Exhibit C (emphasis added). The Court does not agree. This document is not the

benefit plan under review by the Court, nor does it present the standard of termination employed by the Plan. As indicated by the title, it is merely an unbinding synopsis, a "highlight" of benefits. Furthermore, it does not define what is meant by "comparable pay." Participants suffering from long-term disabilities receive benefits equal to two-thirds of their base salary at the time they become disabled. The amount of benefits payable should be the determining factor in deciding whether to terminate benefits. Otherwise, a participant receiving benefits would have incentive to turn down positions which would actually pay more than the benefits received.