Homer RICHARDS; Anna Mae Richards, Plaintiffs–Appellees,

v.

UNITED MINE WORKERS OF AMERICA HEALTH AND RETIREMENT FUND; Joseph P. Connors, Sr.; Donald E. Pierce, Jr.; William Miller; William B. Jordan; Paul R. Dean, Trustees of the United Mine Workers of America 1974 Pension Trust, Defendants–Appellants.

No. 87–2154.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 11, 1989.

Decided Jan. 30, 1990.

Rehearing and Rehearing In Banc Denied Feb, 27, 1990.

Andree M. St. Martin, Associate Gen. Counsel (David W. Allen, Gen. Counsel, Charles G. Starrs, Sr. Associate Counsel, Margaret M. Topps, Associate Gen. Counsel, Edward J. Gilmartin, Associate Counsel, Washington, D.C., UMWA Health & Retirement Funds, Office of Gen. Counsel, on brief), for defendants-appellants.

Edmund A. Sargus, Jr. (Burech & Sargus, St. Clairsville, W.Va., Chris Riley, Riley & Kidner, Wheeling, W.Va., on brief), for plaintiffs-appellees.

Before MURNAGHAN, SPROUSE and CHAPMAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Here the Fourth Circuit tries for a third time to decide an appeal which has twice split the same panel (Judges Hall, Wilkinson and Merhige, sitting by designation). The panel of the Fourth Circuit that first heard the case initially reversed the district

court, finding substantial evidence to support the Trustees' decision denying benefits to a miner claiming disability. *Richards v. United Mine Workers Health & Retirement Funds*, 851 F.2d 122 (4th Cir. 1988) ("*Richards I*"). On rehearing, however, the panel split three ways.

### FACTS

Homer Richards suffered chest pains while lifting 100–pound timbers at a mine site on January 30, 1981. He remained on the job, but did no heavy lifting the rest of the day. The mine operator made no accident report, and there was no independent verification of Richards' injury from eyewitnesses who were with him at the mine that day. The chest pains apparently subsided that evening, and the next day Richards attended a wrestling match. There he again suffered severe chest pains. He was taken to a hospital, where Dr. C.V. Katsaros diagnosed "acute myocardial infarction"—a heart attack. Richards remained hospitalized for about two weeks. A few months later, he was diagnosed as suffering from a progressive heart disease—"severe coronary artery stenoses"—and was urged to undergo bypass surgery.

Disagreement centers on the date when Richards actually suffered the heart attack. The Trustees of the United Mine Workers of America Health and Retirement Funds appeal the district court order granting summary judgment in favor of Homer and Anna Mae Richards and awarding them disability pension benefits. The Trustees had denied the Richardses' claim for benefits, finding that Homer Richards' disability did not result from a "mine accident." The Trustees claim that the attack occurred on January 31, 1981, while Richards was at the wrestling match. Richards contends that he suffered the heart attack on January 30, while lifting the heavy timbers at work.

The following evidence supports Richards' version of the timing:

[1] Richards' own testimony.

[2] A February 17, 1984, letter from Dr. Katsaros, Richards' treating physician, stating that:

[T]his gentlemen [sic] was enjoying good health until January 30, 1981, at which time he sustained an Acute Myocardial Infraction [sic] while lifting railroad ties in excess of hundred pounds.

It does not appear that Katsaros based the date of the heart attack on any evidence other than Richards' own version of the incident.

[3] An administrative law judge's award of social security disability benefits to Richards. The ALJ set the date of disability at January 30, 1981.

[4] A state workers compensation award that also set the date of disability at January 30, 1981.

[5] A report from a Dr. Shaver, who examined Richards in June of 1981, stating that "[t]his patient sustained a myocardial infarction in January of 1981 which began with localized left precordial pain while in the mine and subsided that evening." As with Dr. Katsaros' report, it is unclear whether Dr. Shaver relied solely on Richards' own version of the timing of the attack or had independent verification.

On the other hand, the record also contains evidence that the heart attack occurred on January 31, 1981, while Richards was away from the workplace:

[1] The lack of any accident report from the mine operator noting Richards' attack or his complaints of chest pains on January 30, 1981.

[2] A February 9, 1981, claim for accident benefits that Richards filed with his employer. On that form Richards listed "1–31–81" as the beginning date of his sickness. The statement also included an "Attending Physician's Statement," presumably completed by Dr. Katsaros, which responded "No" when asked "Is condition due to sickness or accident arising out of patient's occupation?" Also, the person completing the form apparently listed "1–31–81" as the "Date symptoms first appeared or accident happened," but later changed it to "1–30–81." Of course, potential for error was not insubstantial, given the natural tendency to concentrate on hos-

pitalization as the date of onset rather than initial symptoms.

In addition to questions about the date of the heart attack, there are disputes about causation, both of the heart attack and of Richards' disability. The dispute primarily focuses on the conflicting opinions of Dr. Katsaros and Dr. Charles White. Dr. Katsaros opined that while Richards' strenuous work did not cause his progressive heart disease, it "indeed was the precipitating factor in the Acute Myocardial Infraction [sic] [the heart attack]. It is quite possible that the Acute Myocardial Infraction [sic] would not [have] occurred in the absence of such strenuous work."

Dr. White, who, in contrast to the treating physician, Dr. Katsaros, did not examine Richards but merely reviewed his medical records, focused on whether Richards' work activities on January 30, 1981, aggravated his preexisting arteriosclerosis to produce a heart attack. He observed that to induce a heart attack, the "physical exertion must be of a highly unusual character or of unusual severity and more intense or involving greater effort than that regularly performed by the affected person." After examining the records, White concluded:

> The problem is, of course, due to his severe arteriosclerotic coronary artery disease, which can in no way be attributed to his occupation. Mr. Richards was performing his ordinary duties at the time he first suffered chest pain. There is nothing to indicate unusual strain or work effort at the time. *In my opinion, the infarction would have occurred whether he had been working or sitting at home.* There is thus no relationship between his work and the coronary occlusion, the underlying coronary artery disease, or his heart condition subsequent to the myocardial infarction.

(Emphasis added.)

## DISCUSSION

### A. *Standard of Review*

Since the appeal was last heard, the Supreme Court has decided *Firestone Tire & Rubber Co. v. Bruch,* — U.S. —, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), which al-

tered the standard for reviewing Trustees' disability decisions. Prior to *Bruch,* we reviewed such decisions under the "arbitrary and capricious" standard. After *Bruch,* a denial of pension benefits should be "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch,* 109 S.Ct. at 956. However, "[w]here the administrator or fiduciary has discretionary authority, an *abuse of discretion standard* should apply." *Boyd v. Trustees of United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59 (4th Cir.1989) (emphasis added) (citing *Bruch,* 109 S.Ct. at 955).

Here, "abuse of discretion" is patently the proper standard of review. The UMW Pension Plan explicitly grants the Trustees broad discretionary authority. *Boyd,* 873 F.2d at 59 (interpreting UMW Pension Plan). Article VIII of the Plan provides that the Trustees "shall have full and final determination as to all issues concerning eligibility for benefits." Article VIII also authorizes the Trustees "to promulgate rules and regulations to implement [the] Plan," and emphasizes that "those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under [the] Plan."

It is unclear whether the "abuse of discretion" standard adopted in *Bruch* is synonymous with the "arbitrary and capricious" standard previously used by the Fourth Circuit and most other courts to review denials of disability benefits under pension plans. Some post-*Bruch* cases suggest that the two standards are synonymous. *See, e.g., Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 39 (11th Cir.1989). No Fourth Circuit case directly addresses the point, although the Court has emphasized that if a decision would be "arbitrary and capricious" under pre–*Bruch* standards, it would be an "abuse of discretion" under *Bruch. Boyd,* 873 F.2d at 60.

Although the "abuse of discretion" standard is perhaps broader and less defer-

ential than the "arbitrary and capricious" standard, "arbitrary and capricious" definitely is encompassed by "abuse of discretion." Since we conclude that the Trustees acted in an arbitrary and capricious manner in denying benefits to the Richardses, it follows that they also abused their discretion under the Pension Plan.

### B. *Merits*

■ Richards qualifies for disability pension benefits if he has been "totally disabled as a result of a mine accident...." Pension Plan Art. II.C. Richards unquestionably is "disabled." Richards receives social security disability insurance benefits, and as this Court has emphasized, "a Social Security disability award conclusively establishes the medical disability of the pension applicant." *Boyd,* 873 F.2d at 59 (quoting *Robertson v. Connors,* 848 F.2d 472, 475 (4th Cir.1988)). We must focus, therefore, on whether Richards' disability resulted from a mine accident.

Three arguments have been advanced to uphold the denial of benefits:

[1] Richards' disability resulted from his progressive coronary disease, not from his heart attack.

[2] Richards' heart attack was not a "mine accident" because it was precipitated by his progressive heart disease, not by his work at the mine.

[3] Richards' heart attack was not a "mine accident" because it occurred on January 31, 1981, while Richards was away from work.

### 1. The heart attack did not cause the disability

As Judge Hall noted, the Trustees have conceded this point:

I would note initially that although the Trustees did suggest at an early point in the administrative process that Richards was disabled by reason of his coronary artery disease, they have not seriously asserted that position in the appeal. The Fund has essentially conceded that Richards is presently disabled as a result of a

heart attack ("acute arterior-lateral wall myocardial infarction").

*Richards I,* 851 F.2d at 125 (Hall, J., dissenting). *See also* Appellants' Brief at 13 (referring to Richards' "disabling heart attack").

### 2. Richards was not involved in a "mine accident" because his progressive heart disease, not his mine work, induced the heart attack

The panel majority originally relied upon this argument in upholding the denial of benefits. *See Richards I,* 851 F.2d at 124–25. In accepting the argument, the original panel majority focused on the medical opinion of Dr. White and the regulations promulgated by the Trustees to govern pension eligibility determinations. *Id.* at 124. Dr. White opined that Richards' heart attack would have occurred whether he was at work or sitting at home and that the progressive heart disease, rather than the heavy lifting, caused the attack. In addition, the Trustees' regulations that define "mine accident" emphasize that "miners who become disabled by progressive diseases or conditions ... cannot be considered 'disabled as the result of a mine accident.'" Q & A 252.[1] The majority thus reasoned that since Dr. White had concluded that the progressive heart disease caused Richards' heart attack, there was substantial evidence to support the Trustees' conclusion that Richards' disability did not result from a "mine accident."

The reasoning is unpersuasive. First, although there arguably is substantial evidence that Richards would have suffered the heart attack regardless of his work activity, the Trustees' own regulations preclude their reliance on that fact to deny benefits if Richards had the heart attack while lifting 100–pound timbers at work. The Trustees' regulations list several examples of "mine accidents" that enable the miner to qualify for benefits if a disability results. *See* Q & A 252. Among the examples is the following:

---

**1.** The Trustees have set forth many of their regulations in a question-and-answer format.

[A] miner suffers a heart attack while pushing a heavy object in the normal course of his job.

Q & A 252(k). It should be noted that subsection (k)'s reference to "pushing a heavy object" in the mine easily encompasses lifting and moving timbers in the mine. A reading of the Trustees' regulations establishes that, once Richards shows that he suffered a heart attack while lifting heavy objects in the mine, he qualifies for benefits if the heart attack in turn caused his disability. Q & A 252(k) precludes further inquiry into whether the heavy lifting was merely coincidental to or instead actually caused the heart attack. All that matters is that the heart attack occurred during heavy lifting at work.

The original panel majority sought to circumvent Q & A 252(k) by emphasizing that the Trustees' regulations state that "miners who become disabled by progressive diseases or conditions such as black lung, silicosis, tuberculosis, arthritis, rheumatism, etc., cannot be considered 'disabled as the result of a mine accident.'" However, the "progressive diseases" proviso should be read not as an exception to the "heart attack" example in Q & A 252(k), but rather as an instruction on how to handle situations that do not fall into any of the enumerated examples of "mine accidents" in Q & A 252. Q & A 252 in fact provides that, if a heart attack fell under subsection (k)—*i.e.*, if it occurred during heavy lifting, pushing or pulling at work—it would automatically qualify as a "mine accident." However, if the heart attack did not fall within subsection (k) because it did not occur during strenuous activity, then the proviso would apply and the attack would not qualify as a "mine accident" if it arose because of a progressive heart disease, even though the attack took place at work. In essence, Q & A 252(k) establishes that heart attacks that occur during heavy lifting in the mines are caused in substantial part by the miner's work. If the conditions of Q & A 252(k) are met, the Trustees are foreclosed from further inquiry into the actual cause of the heart attack.

In sum, if Richards suffered his heart attack while lifting the heavy timbers at the mine site, his disability was a result of a mine accident and he is entitled to benefits.

### 3. Richards' heart attack did not occur at work

That the heart attack did not occur at work is the Trustees' strongest argument to justify the denial of benefits. The record contains evidence casting some doubt on Richards' claim that the heart attack occurred at work on January 30, 1981. The employer has no record of Richards' complaints of a heart attack or chest pains, and Richards remained at work (though refraining from heavy lifting the rest of the day) even after the alleged heart attack. Richards attended a wrestling match the next day. Perhaps most importantly, Richards indicated on his February 1981 benefits claim report that his "sickness" began on January 31, 1981. On the same report, Dr. Katsaros stated that the "sickness" did not arise out of Richards' "occupation." Moreover, it appears that all the documents in which Dr. Katsaros stated that Richards' heart attack occurred at work were dated *after* the February 1981 report in which Dr. Katsaros indicated the contrary. The implication is that Richards originally acknowledged that he suffered the attack on January 31, but later changed his story when he realized the date would affect his eligibility for benefits.

Weighted against and placing this evidence in equilibrium is Richards' own testimony and opinions by two physicians fixing January 30, 1981, as the onset date. The two physicians, however, may have based their reports of the chronology solely on Richards' version of events, without independent confirmation. Were that the only evidence in Richards' favor that bears on the issue, it would be indisputable that substantial evidence supported the Trustees' denial of benefits and that there was no abuse of discretion. Things in equilibrium are equal in weight. The Trustees' action would not be arbitrary and capricious. However, there is another critical factor that must be taken into account

which predominantly unbalances the scales, eliminates the equipoise.

Both the Social Security Administration and the Ohio Bureau of Workers' Compensation predicated their awards of benefits to Richards on a disability onset date of *January 30, 1981.* We have previously given great weight to the date of disability set by the Social Security Administration in miners' disability cases. *See Robertson,* 848 F.2d at 475 n. 5; *Horn v. Mullins,* 650 F.2d 35, 37 (4th Cir.1981) (date set by Social Security Administration was critical factor in determining cause of disability); *Richards I,* 851 F.2d at 125 n. 1 (Hall, J., dissenting). The social security finding as to the date of onset probably does not by itself decide the matter. Nonetheless, it appears that the social security determination that Richards' disability began on January 30, 1981, is entitled to great weight, reducing, in the present case, the contrary evidence to insignificance.

Although the Trustees have some evidence that Richards suffered the heart attack on January 31, rather than January 30, the solution remains in balance only prior to giving weight to the social security finding. The Trustees have failed to produce sufficient evidence to leave in balance or to outweigh the deference we accord to the determination of the Social Security Administration. The Trustees' denial of benefits therefore is unsupported by substantial evidence and hence is "arbitrary and capricious" and an "abuse of discretion." [2] Among other considerations, the onset of a heart attack need not be precisely contemporaneous with its disabling effects. *See* J. Shepherd & P. Vanhoutte, *The Human Cardiovascular System: Facts and Concepts* 227–30 (1979); J. Stapleton, *Essentials of Clinical Cardiology* 265–67 (1983); *The Heart* 1026–27 (J.W.

Hurst ed.) (5th ed. 1982); *Professional Guide to Diseases* 1113–17 (Intermed Comm. Books 1982).

### CONCLUSION

The evidence shows that Richards suffered a heart attack while lifting heavy timbers at work and that the heart attack caused his disability. Under the Trustees' regulations he therefore was "disabled as the result of a mine accident" and is entitled to benefits under the UMW Pension Plan.

The judgment is

AFFIRMED.

CHAPMAN, Circuit Judge, dissenting:

I dissent. The issue before us is whether the decision of the Trustees denying benefits to Mr. Richards was supported by substantial evidence. The majority states that the standard of review is "abuse of discretion" and then proceeds to use an "arbitrary and capricious" standard. Nevertheless, the question must be resolved by deciding whether there was substantial evidence to support the Trustees' decision. Under the accepted definition of "substantial evidence," [1] the Trustees' decision should be secure from attack. I am persuaded that the majority has engaged in fact finding to reach its decision and fact finding is not one of our options.

Our review of trustees' decisions concerning eligibility for benefits is quite narrow, and it is not expanded simply because we do not agree with the result reached by the trustees. This pension plan was the result of extensive collective bargaining and the Trustees were given the duty and the responsibility of deciding disputed claims for benefits. As we stated in *Berry v. Ciba–Geigy Corp.,* 761 F.2d 1003, 1006

---

**2.** *See Boyd,* 873 F.2d at 60 (to the extent that a benefit plan administrator's actions are "arbitrary and capricious," they are also an "abuse of discretion" under the *Bruch* standard); *LeFebre v. Westinghouse Electric Corp.,* 747 F.2d 197, 207–08 (4th Cir.1984) (to determine whether a plan trustee's action is "arbitrary or capricious," a reviewing court must first decide whether the action is "supported by substantial evidence").

**1.** Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966).

(4th Cir.1985), "That administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional."

There is substantial evidence to support the finding that the claimant's disability is the result of progressive heart disease and not the result of a mine accident.

The majority opinion states, "The record contains evidence casting some doubt on Richards' claim that the heart attack occurred at work on January 30, 1981." At page 137. The majority then outlines what is obviously "substantial evidence" which supports the finding made by the Trustees. The majority also sets forth the evidence opposing the January 30, 1981, date. There is substantial evidence supporting each date. The resolution of this factual dispute requires a fact finder. We are not supposed to be fact finders. This function is properly for the Trustees.

Article II(c) of the 1974 Pension Plan provides disability pension benefits to those persons totally disabled as a result of a mine accident. The Trustees have promulgated various rules, regulations and interpretations of the terms used in the plan, including a question and answer format. The majority gives its interpretation to Question and Answer 252, which is opposite the interpretation given by the Trustees, who promulgated the rules and Question and Answer 252 and know its intent.

The decision of the Social Security Administration as to the onset date of January 30, 1981, is entitled to no weight on the present facts, because the date of onset was not an issue in the social security claim.

The Trustees in making their factual determination were entitled to consider that a heart attack is a painful occurrence, and that under normal circumstances a miner sustaining such an attack on the job would have notified someone of his condition. In Richards' case, if he discontinued lifting, he would have notified someone or requested someone to lift for him. There is no dispute that Richards sustained a heart attack at the wrestling match on January 31, 1981, and that this attack was sufficient to hospitalize him immediately. Within ten days of this attack, Richards filed a claim for benefits from his employer stating that the attack date was January 31, 1981, and his attending physician completed a form stating that Richards' condition did not arise out of his occupation.

There is a dispute among the doctors as to whether the disability is a result of an accident or a progressive disease. The Trustees resolved this question in favor of disease, but the majority of our court has made a factual finding that it was an accident.

In *LeFebre v. Westinghouse Electric Corp.*, 747 F.2d 197, 207 (4th Cir.1984), we stated that pension fund trustees have "the obligation to guard the assets of the trust from improper claims, as well as the obligation to pay legitimate claims." The Trustees in the present case have discharged their obligation by making a factual finding which required them to consider the credibility of witnesses and conflicting evidence. There is substantial evidence to support the finding made by the majority, but there is also substantial evidence to support the factual finding made by the Trustees. However, the Trustees, and not we, are in the fact finding business, so I would reverse the district court and remand the matter with directions to enter judgment in favor of the Trustees.