**Zeffie R. BROGAN, Plaintiff,**

v.

**Michael H. HOLLAND, et al.**

**Civ. A. No. 2:95–0143.**

United States District Court,
S.D. West Virginia,
Charleston Division.

Dec. 13, 1995.

Robert B. Wilson, Charleston, WV, for plaintiff.

Matilda A. Brodnax and Glenda S. Finch, UMWA Health & .Retirement Funds, Office of the General Counsel, Washington, DC, Mary Jane Pickens, Shari L. Collias and Susan Cannon–Ryan, Caldwell, Cannon–Ryan & Riffee, Charleston, WV, for defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are the cross motions of the parties for summary judgment.[1]

### THE PENSION PLAN

Mr. Brogan seeks disability retirement benefits from the United Mine Workers of America 1974 Pension Trust. He applied for a disability pension based on a stroke that allegedly occurred while he was working in the mines on the nightshift of December 17 and 18, 1986. The Trustees denied Mr. Brogan's application for a disability pension on March 7, 1988. Article II. C. of the 1974 Pension Plan describes the eligibility requirements:

> A participant who (a) has 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident ... shall, upon retirement, be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance ("SSDI") Benefits....

Defs.' Mem.Supp.Summ.J. at 2. The Trustees determined that Mr. Brogan is disabled, is receiving SSDI benefits, and has 12¾ years of signatory service in the coal industry. The Trustees refused to certify Mr. Brogan's eligibility based on their conclusion that he failed to prove he was totally disabled as a result of a mine accident.

Although the 1974 Pension Plan does not define the term "mine accident," the Trustees have promulgated, pursuant to their rulemaking authority, a series of interpretive guidelines called "questions and answers" (Q

---

1. The standard used to determine whether a motion for summary judgment should be granted or denied has been stated by our Court of Appeals as follows:

> A moving party is entitled to summary judgment 'if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.' Fed.R.Civ.Pro. 56(c). See Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir.1979).
> A genuine issue exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. Id. at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990), cert. denied, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. Id.

Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.), cert. denied, — U.S. —, —, 115 S.Ct. 67, 68, 30 L.Ed.2d 24 (1994).

& A) to aid in interpreting the provisions of the plan. Q & A 252 provides a miner is totally disabled as a result of a mine accident if the following conditions are met:

(1) *Unexpectedness:* The disability must have been unlooked for and unforeseen; (2) *Definiteness:* The disability must be traceable to. a definite time, place and occasion which occurred within the course of the mine worker's employment. A progressive disease does not meet this test and therefore cannot be a disability that resulted from a mine accident; (3) *Force or Impact:* The disability must have been caused by the exertion or impact of some external physical force or object against the body or by the exertion or impact of the body against some external physical object; i.e., not simply as the result of the mine worker's own physical condition.

Def.'s Mem.Supp Summ.J. at 3. Q & A 252 also provides examples of mine accidents including when "a miner suffers a heart attack while pushing a heavy object in the normal course of his job." *Id.*

## FACTS

Mr. Brogan was employed by Westmoreland Coal Company as a beltman and sometimes performed the duties of an electrician and welder. He last worked on December 18, 1986. Mr. Brogan's duties often involved strenuous physical labor including shoveling coal and lifting and carrying heavy objects. During the three weeks preceding December 18, Mr. Brogan worked extensive overtime. Although his precise schedule is not available, it is clear Mr. Brogan worked at least eight to twelve hours for six days each week during the period involved.

On Friday, December 12, 1986 Mr. Brogan began experiencing dizziness and he was having difficulty maintaining his balance. Brogan's condition worsened the following week. On the night of December 17, 1986, he was asked to work overtime on a welding job. He testified at a December 18, 1989 State Workers' Compensation hearing he had been engaged in welding on a scoop on the night of December 17 and into the morning of December 18, 1986 and as part of that task he was required to carry heavy tanks and lift

cables and jacking scoops. His foreman testified Mr. Brogan had an odd expression on his face that night:

We had discussed the work I was wanting done and this and that and a post on the miner broke off—about his welding it on. And his and Joe Athey and two or three other ones around there—I noticed Brogan that night that something was wrong. I asked if something was wrong and [Mr. Brogan] said, "No, I can handle it." . . . Well something just wasn't right. . . . Yeah the way he looked in his face, no walking or nothing like that—there was no slur in his voice or nothing like that. . . . I believe I said we could do it another time if we had to if something was wrong but he did do my welding.

Defs.' Mem.Supp.Summ.J. Ex. A at 536, 537. Mr. Brogan testified:

I was welding on a scoop down at the end of the track and a stop broke on the miner and Herman Miller come down and told me both scoops were tore up. I carried tanks up there to the equipment. Van Horn came up later, I remember telling Van Horn I just didn't feel good or something and he said he would have somebody stay in with me. I said, "Okay, I will stay in and fix it." I knew something was wrong with me but I thought that I was just tired.

*Id.* at 552. Mr. Brogan stated that, although he had been having some balance problems and dizziness for a few days prior to the December 17–18 shift, he did not "actually start falling down" until December 18. Neither Mr. Brogan nor anyone for him filed an accident report with the mine operator reporting Mr. Brogan's stroke or any related event of December 17–18.

Mr. Brogan completed the welding job at 3:30 a.m. on December 18 and went to bed around 5:00 a.m. He awoke at 10:00 a.m., ate, took his insulin and other medicine, and slept until noon. When Mr. Brogan awoke again, his left side was partially paralyzed. He remained in bed for the rest of the day and went to the hospital the next day. Upon admission to the hospital on December 19, Mr. Brogan's condition was diagnosed as "right hemisphere infarct resulting in left

hemiplegia [paralysis affecting the left side of the body], diabetes . . . and hypertension." Defs.' Mem.Supp.Summ.J. Ex. A at 606.

In October 1987, Dr. Sharma, an internist who had examined Mr. Brogan upon his re-admission to the hospital in September, opined on a disability form Mr. Brogan's stroke, hypertension, and diabetes were not related to his employment. Defs' Mem.Supp. Summ.J. Ex. A at 396. According to Dr. Ignatiadis, a consulting neurologist during Mr. Brogan's first hospitalization, the paralysis was "due to a stroke of the right hemisphere [of the brain] which was felt to be secondary to his diabetes involving the brain vessels." *Id.* at 240.

On October 26, 1987, an Administrative Law Judge awarded Mr. Brogan Social Security Disability Insurance benefits. The ALJ found, "[a]s of the date claimant suffered the stroke, December 17, 1986, he no longer had the residual functional capacity to engage in a full range of even sedentary work due to the fact that he has had practically no use of his left upper extremities and also has double vision." *Id.* at 138.

In February, 1988, Mr. Brogan applied for a disability pension from the 1974 Pension Trust. That application was denied on the basis he had not proven he was injured in a mine accident on December 17, 1986. Mr. Brogan's application for West Virginia workers' compensation benefits was denied in December, 1988.

Dr. Ignatiadis' report of March 21, 1989, states, "[w]ith a great deal of medical certainty there is no question in my mind taking into account his type of work he has done, and with my knowledge of being diabetic and working so long, that it precipitated, in my opinion, the development of the cerebral stroke. . . . Again, the type of work he did, in my opinion, most likely is the culprit in initiating the stroke. . . ." *Id.* at 51. Dr. Ignatiadis stated. Mr. Brogan's stroke occurred three days before he was admitted to the hospital. If that opinion is accurate, the stroke would have occurred one or two days before the nightshift of December 17 and 18. Dr. Ignatiadis believes Mr. Brogan worked with weakness following the stroke and that

this explains the swaying while walking Mr. Brogan experienced during that period.

In April of 1989, Dr. Sharma changed his opinion. In testimony during the workers' compensation hearing, he said:

I agree with Doctor Ignatiadis' letter dated 3–21 as stating that long hours of work possibly may have precipitated the stroke. . . . If a patient has a problem, underlying problems, prolonged, long hours, overwork, tiredness, it can unmask a stroke. It can unmask and cause problems.

*Id.* at 490. According to Dr. Sharma, a stroke involves a "special event," such as not being able to walk, that lets a person know something is wrong. *Id.* at 509. Dr. Sharma stated Mr. Brogan reported staggering, unsteadiness, and an inability to walk nearly a week before his hospitalization. *Id.* at 499–500.

Several other doctors were consulted between 1990 and 1993. Dr. Chillag, an orthopaedic surgeon, when asked during the workers' compensation hearing whether heavy labor and long hours could have caused Mr. Brogan's stroke, responded:

Yes. It could very well have been a causation of his stroke with the type of work he was doing. . . . We know the type of work he was engaged in, lifting and straining, is capable of elevating the blood pressure. And if there was any predisposing factors which would have weakened his circulation, we know that the blood pressure in the brain could have increased to the point where the straining was capable of causing a hemorrhage or an infarct. . . . It could very well have been the precipitating factor that caused his hemorrhage. I don't think anyone can state definitely, but he certainly has all the background and the incident to have caused it from his work. . . . With a reasonable degree of medical certainty I can state that [Mr. Brogan's heavy work] certainly could have caused his stroke.

*Id.* at 1061, 1062.

Dr. Chattin, a doctor of osteopathy who testified at the same hearing, also believes

"the stroke was related to work." Dr. Chattin stated the stroke was:

> Due to the fact that in all probability where he was working and he was carrying something. I feel that what happened was that his blood pressure went so high. Based on all the blood pressure prior to his going to work, his pre-employment was normal, but then he had a stress test and his blood pressure went exceedingly high. They had to even give him nitroglycerin to lower the blood pressure. That kind of makes you wonder that any type of strenuous work that he would have done would have also raised the blood pressure such as it did and that led to the stroke.

*Id.* at 682, 683. Dr. Chattin testified Mr. Brogan experienced "symptoms of dizziness and feeling off balance for a couple days" before the stroke and admission to the hospital. According to Dr. Chattin:

> The last day at work he was carrying an oxygen tank and stated that he carried it approximately one quarter of a mile up to a miner. As he started carrying the tank, he got wobbly and had more loss of balance.... He stated he tried to finish his work, however he kept falling to one side, and as the headache progressed at approximately 5:00 a.m. a friend drove him home and he went to bed.

*Id.* at 1090.

Dr. Robert A. Pederson, a neurologist concurs in the hypothesis that physical exertion was a factor in Mr. Brogan's stroke. Dr. Pedersen, in a written report, lists four factors he believes contributed to Mr. Brogan's stroke: 1) chronic diabetes; 2) high blood pressure; 3) cigarette smoking; and 4) "the stress that the patient was experiencing in light of the nature of his physically demanding work as well as the fact that extended work hours may have caused some emotional stress as well." *Id.* at 76. In regard to the fourth factor, Dr. Peterson stated, "it is my opinion that stress in the form of physical exertion was a factor in aggravating this patient's hypertension and diabetes and subsequently causing a cerebrovascular accident, an event which I would note is very uncommon in a patient his age."[2] *Id.* at 77.

Dr. A.L. Poffenbarger, a neurologist, was less certain about the link between strenuous physical activity and Mr. Brogan's stroke. When asked during a deposition if heavy lifting could precipitate a stroke, he replied, "[i]f this stroke happened at a time when he was doing heavy lifting, like I say, it could be an aggravating factor, but not the prime cause." *Id.* at 1030. Dr. Poffenbarger stated it would be speculative to say long work hours or physical labor affected the onset of the stroke. *Id.* at 1046. Dr. Poffenbarger also opined that the dizziness experienced by Mr. Brogan during the week preceding December 18 was not necessarily associated with the stroke, but could have resulted from the hypertension alone. According to Dr. Poffenbarger:

> In a classical picture with somebody with a left-sided stroke, would be to have loss of vision in the right eye, ... coupled with weakness of the left side of the body that lasted a few hours then it cleared and went away. That would be a clear-cut picture, but its rather vague, and knowing that he was hypertensive, he was taking insulin; that can make you dizzy sometimes, too.

*Id.* at 1040, 1041.

Dr. Albert Heck, a neurologist, found no connection between Mr. Brogan's work and his stroke. He testified in the workers' compensation hearing:

> from November until he had his stroke— he'd been working some overtime shifts and had some dizziness intermittently when he got tired, but I don't think there's any causal relationship.... Working long hours and being under stress might accelerate the hypertension, as this relates to the stroke, but the usual relationship between hypertension and an onset of stroke involves hemorhagic stroke and not the kind of stroke that this man experienced.

*Id.* at 639.

In May, 1993, an administrative law judge reviewed the testimony of all of the doctors who treated or evaluated Mr. Brogan and upheld the denial of his workers' compensation claim. The ALJ determined Mr. Brogan

---

2. Mr. Brogan was less than forty years old at the time of the stroke.

had not established "a definite, isolated, fortuitous occurrence" that would connect his stroke with his employment. *Id.* at 873.

The Trustees of the UMW Pension Plan originally denied Mr. Brogan's application for benefits on March 7, 1988, "because he did not establish that he was involved in a mining accident." *Id.* at 67. There is no indication in the record of how that decision was reached. In making the determination, the Trustees neither examined his medical records nor contacted any potential witnesses. Mr. Brogan submitted additional information to the Trustees of the 1974 Pension Plan in support of his application for a disability pension in June, 1994. On July 13, 1994, a senior eligibility processing manager at the Funds wrote a memorandum to the director of the Madison, West Virginia field service office directing her to perform an investigation into Mr. Brogan's application. The memorandum stated, "To determine if Brogan sustained a mining accident, I believe you will have to gather as much information as possible related to the events of the day— what kind of work he was doing, when did the symptoms begin, etc. To do this, I suggest you contact co-workers, the Employer, and possibly Workers' Compensation." *Id.* at 67. No such investigation was conducted. The Trustees' obtained a copy of Mr. Brogan's workers' compensation file which contained copies and reports of all of the medical evidence cited above. The Trustees seem to have based the reconsideration and subsequent denial of Mr. Brogan's pension entirely on that file. The denial of Mr. Brogan's reconsideration request dated February 6, 1995 simply states he failed to establish that there was a mine accident without further discussion.

## STANDARD OF REVIEW

■ The standard of review of a decision made by trustees of an ERISA benefit plan is *de novo. Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Richards v. United Mine Workers of America Health and Retirement Fund,* 895 F.2d 133, 135 (4th Cir.1990); *de Nobel v. Vitro Corp.* 885 F.2d 1180, 1186 (4th Cir.1989). However, where

the plan gives the Trustees discretion to determine benefit eligibility or to construe plan terms, the standard of review is whether the Trustees abused their discretion. *Firestone, supra,* 489 U.S. at 111, 109 S.Ct. at 954, 103 L.Ed.2d at 92–93 ("Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers. Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse of discretion. A trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." (citations and internal quotations omitted)).

■ Our Court of Appeals applies the abuse of discretion standard to review of the Trustees' decisions under the 1974 Pension Plan. In *Boyd v. Trustees of the United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59 (4th Cir.1989), the Court of Appeals held, "There is no question that the Trustees of the UMWA Pension Plan here have discretionary authority, since they have the power of 'full and final determination as to all issues concerning eligibility for benefits' and 'are authorized to promulgate rules and regulations to implement this plan. . . .' " The parties likewise agree the appropriate standard of review in this case is whether the Trustees abused their discretion.

In *Lockhart v. United Mine Workers of America 1974 Pension Trust,* 5 F.3d 74, 77 (4th Cir.1993), the Court discussed criteria for determining whether the trustees of an employee benefit plan abused their discretion in denying benefits:

> [W]e must give due consideration, for example, to whether administrators' interpretation is consistent with the goals of the plan; whether it might render some language in the plan meaningless or internally inconsistent; whether the challenged interpretation is at odds with the procedural and substantive requirements of ERISA itself; whether the provisions at issue have been applied consistently; and of course whether the fiduciaries' interpretation is contrary to the clear language of the plan.

The Court noted the "dispositive principle remains, however, that where plan fiduciaries have offered a reasonable interpretation of disputed provisions, courts may not replace it with an interpretation of their own." *Id.*

## DISCUSSION

There is no suggestion by Plaintiff and no indication in the record that any of the first four *Lockhart* factors were violated by the Trustees' decision. The Court will concentrate on the last *Lockhart* factor. The Court of Appeals stated, "[t]he award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself. If the denial of benefits is contrary to the clear language of the plan, the decision will constitute an abuse of discretion." *Lockhart*, 5 F.3d at 78 (citations and internal quotation marks omitted). Article II. C of the 1974 Pension Plan states any participant who becomes totally disabled as a result of a "mine accident" is eligible for a disability pension. Defs.' Mem.Supp.Summ.J. Ex. B at 5. The Trustees found and concluded Mr. Brogan's stroke was not the result of a mine accident. Although the 1974 Pension Plan does not define "mine accident," the Trustees, as noted above, promulgated Q & A 252 to aid in determining what constitutes a mine accident, and they relied on Q & A 252 in determining Mr. Brogan's ineligibility for benefits. The Court, therefore, will base its decision on whether the denial of Mr. Brogan's benefits is contrary to the clear language of the plan based on the language of Q & A 252.

Q & A 252 lists three characteristics that must be present for a disability to be classified as a mine accident: unexpectedness, definiteness, and force or impact. Defs.' Mem Supp.Summ.J. Ex. C at 1. The Trustees concede the first of those characteristics, but argue the alleged mine accident lacks definiteness and force or impact.

According to Q & A 252, for the definiteness factor to be satisfied, the disability "must be traceable to a definite time, place and occasion which occurred within the course of the mine workers' employment. A progressive disease does not meet this test and therefore cannot be a disability that resulted from a mine accident." *Id.* This provision does not require the mine accident to be the sole cause of the disability. In *Robertson v. Connors*, 848 F.2d 472, 475 (4th Cir.1981), the Court of Appeals cited *Horn v. Mullins*, 498 F.Supp. 1197, 1200 (W.D.Va. 1980):

The only reasonable interpretation of the requirement that total disability be "the result of a mine accident," therefore, is that it requires a total disability to have been proximately caused by the mine accident. That is, if the plaintiff was injured in a mine accident and that injury, whether in combination with a previous or subsequent condition, is substantially responsible for the plaintiff's inability to perform his job and for whatever medical and vocational reasons he is unable to perform an alternative job, then his total disability results from a mine accident.

Thus, although there is some evidence that Mr. Brogan would have suffered a stroke regardless of his work activity, the Trustees may not deny benefits based on that possibility if he establishes the stroke was proximately caused by lifting a heavy tank while working in the mines.

The examples of mine accidents listed in the Q & A 252(k) include the following: "a miner suffers a heart attack while pushing a heavy object in the course of his job." The Trustees do not argue "pushing a heavy object" is not analogous to lifting heavy tanks, nor do they contend that a stroke, if it occurred because of heavy lifting in the mines, would not qualify as a mine accident.

According to the clear language of the Trustees' regulations, therefore, once Mr. Brogan shows he suffered a stroke while lifting heavy tanks in the mines, he qualifies for benefits if his disability was caused by the stroke. The Fourth Circuit held Q & A 252(k) "precludes further inquiry into whether the heavy lifting was merely coincidental to or instead actually caused the heart attack. All that matters is that the heart attack occurred during heavy lifting at work." *Richards v. United Mine Workers Health and Ret. Fund*, 895 F.2d 133, 137 (4th Cir.1990). The *Richards* Court pointed out that Q & A 252 states miners disabled be-

cause of progressive diseases "such as black lung, silicosis, tuberculosis, arthritis, rheumatism, etc.," are not considered victims of mine accidents.

> However, "the progressive diseases" proviso should be read not as an exception to the "heart attack" example in Q & A 252(k), but rather as an instruction how to handle situations that do not fall into any of the enumerated examples of "mine accidents" in Q & A 252. Q & A 252 in fact provides that if a heart attack fell under subsection (k)—i.e., if it occurred during heavy lifting, pulling or pushing at work—it would automatically qualify as a "mine accident." However, if the heart attack did not occur during strenuous activity, then the proviso would apply and the heart attack would not qualify as a "mine accident" if it arose as a progressive heart disease, even though the attack took place at work. In essence, Q & A 252(k) establishes that heart attacks that occur during heavy lifting in the mines are caused in substantial part by a miner's work. If the conditions of Q & A 252(k) are met, the Trustees are foreclosed from further inquiry into the actual cause of the heart attack.

*Id.* at 137.

■ The Trustees found Mr. Brogan's stroke did not occur while he was engaged in strenuous physical labor in the mines. The medical evidence in regard to the cause of Mr. Brogan's stroke is mixed. Only Doctor Heck unequivocally asserts that there is no connection between Mr. Brogan's stroke and the work he was doing in the mines. Doctors Ignatiadis, Sharma, Chillag, Chatin, and Pedersen all believe the stroke was brought on by work related stress. Doctors Chattin and Pedersen state without reservation that the stroke was a result of physical exertion, and Doctors Ignatiadis, Sharma, and Chillag believe the stroke could have been caused by heavy lifting. None of the doctors, however, state the stroke was caused by a specific, identifiable act of physical exertion in the mines.

In *LeFebre v. Westinghouse Corp.,* 747 F.2d 197 (4th Cir.1984), the Court explained that an analysis of whether the Trustees abused their discretion begins with whether the decision was supported by substantial evidence in the record before them. *Id.,* at 204. Substantial evidence may be less than a preponderance of available evidence. *Id.* at 208. Thus, even if this Court believes the preponderance of evidence shows Mr. Brogan was injured in a mine accident, it may not find for Mr. Brogan as long as the Trustee's decision is supported by substantial evidence.

The Trustees did not abuse their discretion in this case because their determination that the alleged mine accident lacked "definiteness" and "force or impact" is not unreasonable. Q & A 252 requires a mine accident to "be traceable to a definite time, place, and occasion which occurred within the course of the mine workers' employment." Not only did Mr. Brogan not report the alleged accident to his employer, but he did not apply for workers' compensation benefits until nearly two years after the stroke. The fact that the State Workers' Compensation ALJ determined Mr. Brogan did not suffer a "definite, isolated fortuitous occurrence," Def's Mem. Supp.Summ.J. Exhibit A at 873, is not determinative of whether Mr. Brogan suffered a mine accident under the terms of the 1974 Pension Plan. However, because the ALJ's determination so closely mirrors the Plan's "definite time, place and occasion" standard, the workers' compensation denial is evidence that the Trustees' determination was not unreasonable.

Nor did Mr. Brogan offer any evidence from witnesses to the alleged mine accident. Although the Trustees requested documentary evidence from Mr. Brogan, he never submitted names of his co-workers who allegedly witnessed the accident. Neither did he submit the names, addresses and telephone numbers of any witnesses. The only testimony supporting Mr. Brogan's contention that he suffered the stroke as he lifted an oxygen tank during the December 17–18 nightshift are his statements to that effect made after the commencement of litigation. Mr. Brogan has not, therefore, carried his burden of showing that the Trustees abused their discretion in denying his pension. *See LeFebre* 747 F.2d at 208.

The Doctors who examined Mr. Brogan or his records do not agree about the date on which the stroke occurred. None of the doctors opines with any degree of certainty the specific time of the stroke's occurrence or the specific activity that caused the stroke. There is not even agreement among the doctors whether heavy physical labor could have caused the stroke. Thus the Trustees' determination that Mr. Brogan did not establish his stroke was traceable to a definite time, place and occasion was reasonable. As Dr. A.L. Poffenbarger pointed out, although it is possible that Mr. Brogan's stroke was precipitated by heavy lifting in the mines, that conclusion would be speculative. Given the lack of other evidence supporting the contention the stroke occurred as Mr. Brogan lifted an oxygen tank or some other object, the Court may not substitute its judgment for that of the Trustees. The uncertainties and conflicting evidence before the Trustees at the time they denied Mr. Brogan disability benefits created sufficient doubt about the cause of his stroke to make their denial reasonable.

Some of the doctors believe Mr. Brogan's stroke was precipitated by the stress associated with long hours of heavy work. Even if stress were a precipitating factor, however, the stroke would not necessarily qualify as a mine accident. According to Q & A 252, a mine accident necessarily involves "the exertion or impact of some external physical force or object against the body or by the exertion or impact of the body against some physical object." Defs.' Mem.Supp.Summ.J. Ex. C at 1. A stroke participated by general work-related stress would not, qualify as a mine accident; Mr. Brogan's failure to show that his stroke occurred during a specific act of physical exertion is, therefore, fatal to his claim.

### CONCLUSION

Although there is some evidence that Mr. Brogan's stroke was caused by a mine accident, the Court is unable to determine that the Trustees abused their discretion by finding and concluding it was not. Mr. Brogan has not shown that it was unreasonable for the Trustees to have determined his stroke:

1) was not traceable to a definite time, place, and occasion within the course of his employment; and 2) was not the result of exertion or impact involving an external physical force. The Trustees' decision that Mr. Brogan did not suffer from a mine accident is not, therefore, contrary to the clear language of the Plan as supplemented by Q & A 252.

Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment, **GRANTS** Defendants' motion for summary judgment and **ENTERS** judgment in favor of the Trustees.